GB7YOLAT                        TRIAL

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        12 CR 798 (LAP)

5    REZA OLANGIAN,

6              Defendant.

7    ------------------------------x

8                                        New York, N.Y.
                                         November 7, 2016
9                                        3:45 p.m.

10

     Before:
11
                    HON. LORETTA A. PRESKA,
12
                                         District Judge
13

14                      APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     SEAN BUCKLEY
17   SHANE THOMAS STANSBURY
          Assistant United States Attorney
18
     FREEMAN NOOTER & GINSBERG
19        Attorneys for Defendant
     LEE ALAN GINSBERG
20   NADJIA LIMANI

21

22

23

24

25

GB7YOLAT                          TRIAL

1          THE COURT:  Welcome back, ladies and gentlemen.  Thank

2     you for being so prompt.  That will help us get our work

3     finished.  Won't you be seated.

4          Now that you've been sworn in, ladies and gentlemen,

5     I'd like to give you a few preliminary instructions to guide

6     you in your participation in this trial.

7          As I told you before, it's your function in this case

8     to decide the issues of fact.  Your decision on the issues of

9     fact is to be based solely on the evidence.

10          Nothing I say is evidence.  Nothing any of the lawyers

11     say is evidence.  Questions by themselves are not evidence.

12     Objections are not evidence.  Testimony that's been excluded or

13     that you're told to disregard is not evidence.

14          The evidence consists of the sworn testimony of the

15     witnesses and the exhibits that will be received into evidence.

16     In some instances, there might be facts that the lawyers agree

17     to called stipulations, and that's evidence also.  But if we

18     have any of those, I'll tell you about it at the time.

19          Now, there are two types of evidence, direct and

20     circumstantial.  Direct evidence is, needless to say, direct

21     proof of a fact, usually something that a witness obtained

22     through the use of his or her senses, something he or she saw,

23     touched, etc., etc.

24          Circumstantial evidence is proof of facts from which

25     you may infer or conclude the existence or nonexistence of

GB7YOLAT                        TRIAL

1    other facts.  The example that's always given is assume the

2    shades in the courtroom are closed.  You couldn't see the

3    weather outside, and you couldn't put your arm through the wall

4    and feel the weather outside.

5         But as we were sitting here, someone walked into the

6    back of the courtroom with a dripping raincoat and umbrella.

7    On the basis of those facts, using our common sense, we would

8    infer or conclude that it had been raining outside.  So that's

9    all there is to it.  The dripping raincoat and umbrella is

10   circumstantial evidence of the fact that it has begun raining

11   outside.

12        So we'll do this again at the end of the case, but for

13   now, please have in mind that you may consider both direct and

14   circumstantial evidence in the case.

15        How do you decide what to believe and what not to

16   believe.  Listen to the witnesses, watch them, and observe

17   them.  And then decide whether you believe or disbelieve them

18   the same way that you decide those questions in your everyday

19   life.

20        Did the witnesses know what they were talking about?

21   Were they candid, honest, and truthful?  Did they have a reason

22   to falsify, exaggerate, or distort their testimony?  Use your

23   common sense and your good judgment to evaluate their testimony

24   based on all of the circumstances.

25        Now, it's very important that you keep an open mind

GB7YOLAT                          TRIAL

1    throughout the case.  Don't form any judgments until the

2    evidence has concluded, you've received the Court's

3    instructions on the law, and the case is submitted to you.

4            Remember also that the evidence comes in step by step.

5    First a witness testifies on direct examination, and then a

6    witness testifies on cross-examination.  First the government

7    presents its evidence, and then the defense has the opportunity

8    to present its evidence.

9            So remember that there might be two or more sides to

10   every story, and you will not be in a position to know what you

11   believe or to make any judgment until you've heard all of the

12   evidence and the Court's instructions on the law.

13           Now, would you please be sure that none of your

14   friends or relatives is in the courtroom without my knowledge.

15   It's particularly important that they not be here when you

16   folks are in the jury room.

17           For example, what if you were in the jury room when I

18   was discussing with the lawyers whether or not a particular

19   piece of evidence was properly brought before you for your

20   consideration and I decided that it was not proper, and then

21   you went to lunch in China Town with your friend, and your

22   friend said, so what about that evidence?  Then we'd have to do

23   the trial all over again.  We don't want to do that.

24           If anyone you know comes into the courtroom, would you

25   please let me know at the earliest opportunity.  You can put

1   your hand up.  You can send a note to whoever is sitting at

2   this desk, but please let me know right away.

3          I will reiterate.  Please do not discuss the case

4   among yourselves or with anyone else.  You'll discuss it among

5   yourselves only after all of the evidence is in, you've

6   received the Court's instructions, and you go into the jury

7   room to make up your minds.  Until then, please keep your

8   impressions to yourself, not even boy oh, boy, did you see that

9   guy's haircut.  Nothing.

10          Do not read anything about the case.  Do not listen to

11   anything about the case.  Don't allow anyone to speak to you

12   about the case.  Don't do any research about the case.  That's

13   it.  No research at all about anything to do with the case,

14   including the names of the people involved.  No research.

15          Remember again this is only for fairness to give the

16   parties an opportunity to know what evidence you've heard and

17   also to increase the reliability of the evidence.

18          These evidence rules we have look to giving you the

19   most reliable evidence.  If you get it from some other place,

20   we never know.  So it's just not fair.  So no research, please,

21   on anything.

22          If you want, you may take notes about the case.

23   Remember, though, that the notes are for your own use.  They're

24   not to be given or shown to anyone else.  If you do take notes,

25   please leave them in the jury room at night.  Put your name on

the front of the book and just leave them there overnight.

I'll mention to you again that it's your job not to speak to people involved in the trial, and it's their job not to speak to you.  So it doesn't even matter if it's good morning.  Everyone will understand that the other person is just doing his or her job.

A few more words about trial procedure.  In just a minute, the lawyers are going to have the opportunity to make opening statements.  Now, of course, these statements are not evidence, first of all, because it's a lawyer speaking, and you know that the lawyers do not speak evidence.

But secondly, these statements provide nothing other than an opportunity for the lawyers to tell you a bit about the case and what they think the evidence will show, but those statements are not evidence.  The only evidence comes from the witnesses and the exhibits.

After the opening statements, we'll hear the evidence. Each witness will first give direct evidence, and then there will be the opportunity for cross-examination.  Sometimes there's even redirect and recross.

After all of the evidence is received, the lawyers will have an opportunity to sum up or to make a closing statement to you.  They might review the evidence.  They will no doubt make arguments to you about what they think the evidence shows or doesn't show, but the summations are not

1    evidence.

2              Also if at any time anyone, the lawyers or I, say

3    anything about the evidence that conflicts with your

4    recollection of the evidence, it's your recollection of the

5    evidence that controls.

6              Finally, after the summations, I will give you the

7    Court's instructions on the law.  And following that, you go

8    into the jury room, look at whatever you want to look at in

9    terms of evidence, and make up your minds as to your verdict.

10             At the conclusion of the trial, I'll tell you in

11   detail what the government must prove in order to convict the

12   defendant.  For the most part, I'll just ask you to remember

13   throughout the trial that the defendant is presumed innocent

14   and the government has the burden of proving guilt beyond a

15   reasonable doubt.

16             The indictmen against the defendant is only an

17   accusation and is not evidence or proof of guilt.  The

18   defendant, therefore, starts out with a clean slate.

19             This burden of proof beyond a reasonable doubt is

20   different from the burden imposed upon the plaintiff in a civil

21   case, and this burden is on the government until the very end

22   of the case.

23             I'll tell you more about it in the instructions at the

24   end of the trial, but for the minute, let me just say that this

25   burden means that the defendant and his lawyers need not

1    present any evidence if they chose not to do so.

2          They could sit in silence through all of these

3    proceedings without saying a word, but you could draw no

4    inference against the defendant, if that's what the decision

5    was.

6          You may not find the defendant guilty unless and until

7    you are unanimously convinced beyond a reasonable doubt of his

8    guilt based on all of the evidence in the case.

9          With that, ladies and gentlemen, we will move into the

10   opening statements starting with the opening statement on

11   behalf of the government.  I remind you these statements are

12   not evidence.

13         Gentlemen.

14         MR. STANSBURY:  Thank you, your Honor.

15         Good afternoon.  I'd like to bring you back to 2012.

16   In May of that year, two men met at a hotel in Eastern Europe,

17   and they met to make a deal.  On the surface, they seemed like

18   your ordinary businessmen.  They had lunch, they exchanged

19   pleasantries, they talked about buying and selling things.

20         But if you were there and you were able to listen in

21   about what they were talking about, you would have discovered

22   that many of the items that they were talking about buying and

23   selling were not ordinary -- components for Russian-made

24   fighter jets, military-grade surface-to-air missiles, providing

25   weapons to the government of Iran.

One of these men was a supplier.  He was a broker
based in Russia who had access to the types of military parts
and weapons that I'm talking about.

The other man was this man sitting here, Reza
Olangian.  He was the buyer, the purchaser.  And for the better
part of 2012, he worked tirelessly to get his hands on those
items that I was just mentioning -- military aircraft parts,
surface-to-air missiles, but also many, many other items, all
to sell them in Iran.

He didn't care that as a U.S. citizen, U.S. sanctions
made it illegal for him to sell these goods in Iran, and he
didn't care that it was illegal to buy surface-to-air missiles
so that you can shoot down aircraft.  So why did he do it.
It's simple.  For the money.

Starting in 2012, the defendant was a U.S. citizen
living in Iran, and he was looking for someone who could help
him purchase some military aircraft parts and some other items
that he could sell.

Through a contact, the defendant learned of a supplier
that could help him get what he needed.  So he traveled to
Eastern Europe, and he met with that supplier as I had
mentioned.

In those meetings, the defendant made it absolutely
clear that he had an extensive list of items that he needed to
provide to the Iranian government.  He also made it clear that

GB7YOLA1                              Opening - Mr. Stansbury

he would be interested in buying not just aircraft components
but military-grade weapons systems like surface-to-air
missiles.

When he learned that that Russian supplier could
provide those things, he jumped at that opportunity.  So, over
the next several months, the defendant negotiated a deal that
would basically involve 10 surface-to-air missiles and dozens
of military aircraft components, all of them ultimately to be
acquired and used by the Iranian government.

He examined the missiles he was going to purchase.  He
negotiated the payment terms.  He planned out the methods of
delivery, how he could get the weapons into Iran.  For a while,
it looked like he was going to be able to do it.

You're going to learn that despite his best efforts,
he was never able to carry out that deal, and those items that
he hoped to acquire never made their way to Iran.

Why?  Because while he and his associates were busy
trying to make that deal happen, there were a few things they
didn't know.  They didn't know that the man that they had hoped
to buy from was not actually a weapons and aircraft parts
supplier.  He was actually a confidential source working with
the United States Drug Enforcement Administration, the DEA.

Now, as you'll learn, a confidential source is a paid
undercover informant who works with law enforcement agencies
like the DEA.  This was a carefully coordinated undercover

1   investigation conducted and monitored by a specialized unit in

2   the DEA that was focused on weapons trafficking.

3           The man who was supposedly selling those weapons and

4   other items had been directed by that group to pose as a

5   supplier, but that's not all the defendant didn't know.  He

6   also didn't know that the DEA had outfitted that man, the

7   confidential source, with hidden recording devices.

8           So at every major step along the way during those

9   negotiations, it was documented in a recording, and you're

10  going to see and hear those recordings during this trial.

11          Now, while the confidential source was not actually a

12  Russian-based weapons supplier, the evidence is going to show

13  that the defendant's desire to make this deal happen was very,

14  very real.  His words and his actions are going to show that.

15          So, when the opportunity arose, he took it.  He did

16  everything he could to make it happen.  So, over the next few

17  days, we're going to present to you a great deal of evidence to

18  prove the charges against the defendant.  At the end of the

19  trial, we're going to have a chance to talk to you again and

20  explain how all of that evidence fits together.

21          So don't worry if right now you don't remember every

22  detail that I'm talking about.  It's all going to make sense

23  towards the end of the trial.

24          Today is just a chance for us to give you a preview of

25  what we expect the evidence will show during the trial so that

GB7YOLA1                        Opening – Mr. Stansbury

1   when you hear testimony or see a piece of evidence, you have a

2   sense of how it's going to fit together.

3        So, with that in mind, I'd like to briefly walk you

4   through three aspects of this case:  First, I'd like to

5   describe what we expect the evidence to show.  Second, I'm

6   going to talk to you a little bit about the charges in the

7   indictment, the charging instrument.  Third, I'm going to

8   briefly explain how we're going to prove our case.

9        So how did it all begin.  Well, in 2011, as I

10   mentioned, there was a specialized unit within the DEA called

11   the Special Operations Division that was focused on

12   investigating international weapons trafficking.

13        As part of that investigation, the DEA learned through

14   a confidential source that the defendant was a U.S. citizen and

15   that he was interested in purchasing military-grade items that

16   he ultimately could illegally sell in Iran.

17        So when they found this out, the DEA got to work, and

18   they introduced a second confidential source, and that second

19   confidential source was the one who was going to pose as the

20   supplier, and you'll learn that his name is Max.

21        When the defendant learned that Max could potentially

22   get him what he needed, he wasted no time in going to meet him.

23   So you'll then learn that the deal played out in basically

24   three stages.  The first stage was a set of meetings in Eastern

25   Europe, and this was where the defendant met Max and laid out

what he was looking to purchase.

          The second stage involved negotiating the transaction.
Over the course of the next few months, as I mentioned, the
defendant and Max communicated by telephone and email and
worked out a transaction that, as I said, had a mix of military
aircraft parts and missile systems.

          The final stage was the logistics and execution stage.
This was where the defendant tried to work out the final
arrangements with his counterparts in Iran and where the
parties settled on the final details like purchase price, the
payment methods, the logistics of physically getting these
items into Iran.

          So let's start with the first stage, those meetings in
Europe.  You'll learn that in early 2012, the defendant, who
was living in Iran at the time, traveled to the Ukraine in
Eastern Europe.

          And before the meeting, the defendant had been in
touch by email with a confidential source who went by the name
Mouboriz.  This is a different confidential source than the one
I just mentioned.

          In these emails, the defendant described that he had
contracts with business associates in Iran and that he was
looking to get certain products as a result.

          The defendant wanted things like very specialized
aircraft parts for Russian-made fighter jets, military

aircraft.  He was hoping that Mouboriz could in turn put him in touch with someone who could deliver.

By this time, the DEA was on to the defendant, and they knew what he was looking to do.  So they jumped into action.  They introduced this new confidential source, Max, into the investigation posed as that broker.

So, in the spring of 2012, the defendant traveled from Iran to the Ukraine or Eastern Europe to meet Max and get the deal underway.  Over the next two days, defendant and Max talked through what the defendant wanted to purchase and what Max was capable of providing.

So you'll learn that right off the bat, the defendant made clear who the ultimate purchaser was, who was going to use these items, and that was the government of Iran.

He also made clear that he was looking to purchase very large quantities of whatever Max could provide.  In fact, he even brought a long list of items that he was looking to purchase for his Iranian counterparts, basically like a wish list.

He wanted what were known as cylinders, which you'll learn were specialized parts that could be used in very special Russian-made fighter jets.  He wanted certain aircraft electronic parts and aircraft navigational components.

Some of the things the defendant wanted he decided to talk about only in person.  Among other things, when he learned

1   that Max could offer more than those things that I just

2   described, he made it clear that he wanted to arrange for the

3   acquisition of highly sophisticated weapons systems for the

4   government of Iran.  He wanted to purchase a missle defense

5   system called the ES300.

6          He wanted to purchase specific types of Russian-made

7   missiles used to shoot down aircraft, so-called surface-to-air

8   missiles or anti-aircraft missiles called Iglas.

9          Now, you're going to hear a lot about Iglas in this

10  case, and you're going to hear that this was something the

11  defendant was very interested in because this was not the first

12  time he had tried to acquire them.

13         You see, a few years prior to this meeting in the

14  Ukraine, prior to meeting Max, the defendant had previously

15  tried to supply Igla surface-to-air missiles to Iran, and that

16  deal had gone south.  So the defendant was interested in making

17  that happen this time.

18         So, by the end of those meetings in Eastern Europe,

19  the defendant and Max had worked out a plan of action.  They

20  were going to start with a relatively small shipment, and this

21  was just to get to know each other and gain trust.

22         Then they were going to move on to larger things.  Max

23  was going to go back to his people to find out how much of that

24  wish list that he could deliver on, and the defendant was going

25  to go back to Iran and talk to his associates to get the wheels

GB7YOLA1                      Opening — Mr. Stansbury

1    in motion on that side.  So they exchanged email addresses,

2    phone numbers, and agreed that they were going to be in touch,

3    and they were.

4            That brings us to stage 2, the negotiations.  So, over

5    the next several weeks, the defendant and Max talked in more

6    detail about this first deal that they were going to do

7    together.

8            They sent emails to one another, they had phone calls,

9    and what they settled on relatively quickly was that the first

10   transaction together was going to involve 60 of those cylinder

11   devices that I had talked about and 10 of the Igla

12   surface-to-air missiles.

13           What took a little more time was working things out

14   like payment arrangements and the logistics of actually getting

15   this stuff into Iran across international borders.  So those

16   discussions take place over several months.

17           Remember.  By this stage in the deal, the defendant

18   had made it clear that his main customer was the Iranian

19   government.  So, to avoid any complications or mishaps, he

20   wanted to actually see this stuff.  He wanted to see what he

21   was buying.  So he specifically asked to see the Igla missile

22   system that's being purchased.

23           So Max and the defendant make arrangements to meet in

24   Eastern Europe again where the defendant can take a look at the

25   goods, and that meeting ultimately has to be postponed.  So

GB7YOLA1                        Opening – Mr. Stansbury

1    they turned to plan B.

2             So, instead of the defendant traveling to Europe, they

3    have a video conference, and in that video conference, Max acts

4    like he's at a supply warehouse in Russia.  In actuality, he's

5    with DEA agents who are witnessing and supervising this event.

6             Max shows the defendant a sample of the surface-to-air

7    missle that he's going to purchase, and he answers the

8    defendant's questions about the missle's specifications and all

9    of its capabilities.

10            In this video conference, the defendant is unambiguous

11   about what he wants.  He wants those missiles.  In fact, he

12   wants at least 200 of them.

13            Now, that's not all going to happen at once because

14   remember the defendant and Max had discussed starting with this

15   smaller transaction, a kind of test run that involved 60 of

16   those aircraft parts, the cylinders, and 10 of the missiles.

17            So, in the weeks that followed, they talked through

18   the logistics, and that brings us to stage 3.  So, at this

19   point, there are some final questions that have to be

20   answered -- how is payment going to be made.  How are the

21   cylinders and the missiles going to be delivered inside the

22   Iranian border.  Is the defendant going to bring the missiles

23   inside Iran to test them out before paying for them.  Those are

24   the issues that they had to work out before they could complete

25   and execute the deal.

1    So, over the next several weeks, the defendant and Max

2    sort out those details.  In the meantime, the defendant gets

3    his people in Iran ready for the shipment.

4    He arranges for an expert to look at the missle system

5    and begins making arrangements for a field test of the missile

6    system.  He has meetings with Iranian government official to

7    discuss the acquisition.

8    Then in October of 2012, the defendant arranged one

9    final meeting with Max.  The meeting was again supposed to take

10   place in Eastern Europe, this time in the country of Estonia.

11   But before the defendant could have that other

12   meeting, before he could go any further with his plan to

13   provide those missiles and aircraft parts to the Iranian

14   military, he was arrested at the airport by the Estonian

15   police, and then he was later transferred to the United States.

16   That basically brings us to where we are today.

17   Now, let me take just a moment to talk about the

18   charges in the case.  The defendant is charged in four

19   different counts.  Judge Preska gave you a small preview of

20   this, but I just want to talk briefly about these.

21   Now, two of the charges are conspiracy charges, and a

22   conspiracy is basically an agreement among people to break the

23   law.  In one of the counts, the defendant is charged with

24   conspiring to acquire or transfer surface-to-air missiles, and

25   the other conspiracy count charges the defendant with

GB7YOLA1                    Opening – Mr. Stansbury

conspiring to violate what you heard is called the

International Emergency Economic Powers Act or IEPA for short.

And you're going to learn a lot more about IEPA from

Judge Preska at the end of the trial, but basically this charge

relates to efforts by the defendant who, again, is a U.S.

citizen, to break the laws that prohibit U.S. citizens from

selling goods to Iran.

The other two counts in the indictment are attempt

charges, and they charge the defendant with actually attempting

to acquire and transfer the surface-to-air missiles and

attempting to violate IEPA.

So how are we going to prove these charges.  Well, I

told you earlier that there were some things the defendant

didn't know when he was negotiating that deal.  He didn't know

that the entire time he was negotiating the deal, he was

meeting and communicating with a man who was a paid

confidential source for the DEA.

That confidential source, Max, is going to come into

this courtroom.  He's going to take the witness stand over

here, and he's going to tell you what he saw and what he heard,

and he'll take you through the deal from start to finish.

I also told you that the defendant didn't know he was

being captured on tape.  From the very beginning, from the time

the defendant walked into that first meeting in Eastern Europe

with Max, the defendant was being recorded.

1          You see, the DEA was also in the Ukraine at that time,

2     and before those meetings, they had outfitted Max with hidden

3     recording devices.  So, when the defendant starts talking to

4     Max about his plans to provide all of those items to Iran, it

5     was all caught on tape.

6          The DEA also had Max record his telephone calls with

7     the defendant, and you're going to hear the defendant in his

8     own words negotiating the deal in those weeks and months that

9     passed.  You'll also see video footage.  You'll see video

10    footage taken by agents who are watching as the defendant met

11    with the confidential source.

12         You'll see the video conference where the defendant

13    was shown a sample of the surface-to-air missiles he was trying

14    to buy.  You'll be able to watch as the defendant carefully and

15    meticulously studied the missle and requested the exact

16    specifications.

17         That's not all.  As I mentioned before, the defendant

18    also communicated by email a lot.  Those emails were recovered

19    and preserved in the DEA's investigation, and you'll be able to

20    review them yourselves.  You'll see the defendant's own words

21    in black and white, words that make absolutely clear his

22    intentions and his actions, words that he can't take back now.

23         I want to be clear about something.  Those are

24    communications not just with the confidential source, not just

25    communications relating to the deal I just described, but other

GB7YOLA1                          Opening - Mr. Stansbury

deals that the defendant had brokered and was brokering while
he was dealing with the confidential source.

You're also going to be seeing documents like the list
the defendant took with him to those initial meetings in
Europe.  You'll see documents that were recovered from the
defendant's laptop computer and other electronic media that he
had with him when he was arrested, documents like specification
names for Igla missiles that the defendant was trying to
acquire, documents related to the defendant's prior attempt a
few years earlier to negotiate a weapons sale with the
government of Iran.

You'll hear from witnesses.  As I mentioned, you'll
hear from the confidential source who dealt directly with the
defendant, but you'll also hear from other types of witnesses.

You'll hear from law enforcement agents who were
involved in the defendant's arrest.  For example, you'll hear
from one of the case agents who helped start the investigation
and who gave direction to the confidential source along the way
who witnessed many of the events that took place.

You'll hear from other types of witnesses.
For example, you'll hear from a computer forensics examiner who
analyzed the defendant's laptop computer that the defendant had
with him when he was arrested.  She'll walk you through the
analysis and how the DEA was able to recover and reconstruct
some of the documents that were on the computer, including

GB7YOLA1                          Opening – Mr. Stansbury

files that had been deleted.

On top of all that, you'll also hear about statements that the defendant himself made about his own criminal conduct. You see, after the defendant was arrested in Estonia, the DEA, which had been coordinating with Estonian police, interviewed him.

In his meetings with the DEA, the defendant confirmed, in his own words, what had already been clear throughout the investigation, that he had been engaged in extensive negotiations to purchase cylinders, Igla missiles, and other items, all of this to be sold to the Iranian government.

So, as you've gathered by now, there is a lot of evidence in this case -- hours of recorded meetings and phone calls, video footage capturing the defendant in the act, dozens of incriminating emails, parts lists, contracts, other documents. Let me make one thing clear right now. This is not a complicated case. In fact, it's straightforward.

The defendant was a man looking to make a profit, a substantial profit, and he was so eager to make money that he was willing to buy and sell anything to anyone, even if it was illegal.

So, when he was given that chance to purchase hundreds of thousands of dollars worth of deadly weapons and other items for the government of Iran, he didn't even hesitate. He jumped at it. Fortunately, he didn't succeed. He was caught in the

GB7YOLA1                    Opening – Mr. Stansbury

1    act, and he was caught on tape.

2         Now, as I mentioned before, we're going to have a

3    chance to talk to you again at the end of the trial, and we'll

4    walk you again through the evidence that you've heard during

5    the trial.

6         But between now and at that point, I just want to ask

7    you to do three things:  First, please carefully evaluate each

8    and every piece of evidence that comes before you.

9         Second, please pay careful attention to Judge Preska's

10   instructions on the law.  She's going to give you instructions

11   along the way in this trial on how you can use the evidence

12   that's presented, and she'll give you, as she said, more

13   instructions at the end of the trial.

14        Finally, as you evaluate the evidence and you listen

15   to those instructions, I'd like you to apply your common sense,

16   the same common sense that you use in your everyday lives to

17   make important decisions because that's probably the best guide

18   you have.

19        If you do those three things, the defendant will have

20   a fair trial, the government will have a fair trial, and you're

21   going to reach the only verdict that is consistent with the

22   evidence, that the defendant is guilty as charged.  Thank you.

23        THE COURT:  Thank you.

24        Ladies and gentlemen, we now move to the opening on

25   behalf of the defense.

GB7YOLA1                          Opening - Mr. Ginsberg

1              Mr. Ginsberg.

2              MR. GINSBERG:  Thank you, your Honor.

3              THE COURT:  Same rules.  This statement is not

4      evidence either.

5              MR. GINSBERG:  Your Honor, my colleagues,

6      Mr. Olangian.

7              It's always a privilege to be able to stand before a

8      jury in a courtroom in a criminal trial in the United States

9      and represent another human being.  It's an awesome privilege

10     and responsibility and one which I have accepted.  That's what

11     I do.  But accept it or not, it's a privilege to be able to do

12     that.

13             It's particularly a privilege today because, without

14     going into any detail, we've had a pretty crazy year in this

15     country.  And tomorrow, as we all know, is election day.

16             I think, of all the trials I've ever had, I have not

17     had to give an opening statement on the day before election day

18     before, but during that process, there's been talk about the

19     Constitution, what it means, what this amendment means, what

20     this act means, what you can do, what you can't do.

21             The Constitution of the United States is written on a

22     piece of paper, but when it comes to the criminal justice

23     system and a criminal case and somebody has been charged with a

24     crime and alleged to have done it, you, ladies and gentlemen,

25     become the Constitution.  You give life to the Constitution.

GB7YOLA1                    Opening - Mr. Ginsberg

1    Because, as we all know, a person is entitled to a trial by his

2    or her peers where an impartial and fair jury listens to all

3    the evidence and makes a decision according to the facts and

4    the law.

5              The decision about somebody's guilt or nonguilt is not

6    made at this table.  It's not made by these prosecutors or the

7    agents.  It's made by you because the Constitution says that's

8    the way it should be, it ought to be, and it will be.

9              So you give light to the Constitution here today and

10   throughout this trial.  There is almost no more sacred an

11   obligation except maybe your obligation tomorrow to exercise

12   your right to vote because you give voice to one of the most

13   important things that we all share in this country.

14             You just witnessed the jury selection process, and

15   however you may feel about sitting here having been chosen as a

16   juror or alternate, you saw the care that was taken by the

17   judge and by the parties to ask questions, sometimes to probe a

18   little bit, to make sure that each one of you came into this

19   case, sat here as a juror, and had the ability to be fair and

20   impartial, not be overwhelmed by what the charges are or the

21   language you may have heard or even the opening statement,

22   which is not evidence, of the government.

23             But you all had and demonstrated a willingness to be

24   fair and impartial.  What goes along with that as the trial

25   progresses is your ability, each one of you, to keep an open

GB7YOLA1                        Opening – Mr. Ginsberg

mind because the evidence will come in in pieces.

          There will be different witnesses, and the temptation
may exist when you hear one witness to come to a conclusion,
but you haven't yet possibly heard the second or third or
fourth or fifth witness.

          Also the way that a trial progresses is that the
government goes first.  They have the burden of proof.  So you
heard from Mr. Stansbury first, and now you're hearing from me.

          The government will call its witnesses on what's
called direct examination, and then I will have an opportunity
to conduct a cross-examination.  So I ask you, even as to each
witness, when you've heard the direct examination, continue to
keep an open mind.  There's more to come.

          That will continue through the government's case until
the government rests.  After the government rests, as
Judge Preska has told you, the defense has no obligation to put
on any witnesses in the case.

          I could sit there with my client and basically say to
the government, prove it.  Prove it beyond a reasonable doubt,
and then come up to you and say, they haven't proven the case
beyond a reasonable doubt.  I don't have to do anything.

          But I'll tell you now, ladies and gentlemen, that's
not what we're going to do.  You will hear testimony from our
side.  You will hear testimony about all of these things you
just heard in the opening statement.

1          And, frankly, we embrace the evidence that the

2    government is going to put on.  We're glad for the audio and

3    video and the emails because it will demonstrate to you that

4    beginning as early as 2007/2008, Mr. Olangian did contact

5    buyers and sellers for these various pieces of equipment and

6    material and even the surface-to-air missiles.

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              MR. GINSBERG:  But you will hear why he did that and

2      why that happened.  And you will hear that going back as early

3      as the 1980s how members of his family had been imprisoned,

4      beaten, tortured, harassed by the Iranian government.

5              Now as some of you may know, the judge has made

6      reference before to age categories -- and I'm not going to get

7      too specific -- but there's a history in Iran and that younger

8      members of the jury may only know about or remember the more

9      recent time period where we've all heard things about the

10     government of Iran and we've heard from their leaders about

11     their views.  But there is a period that goes back to when

12     there was a king, a Shaw in Iran, and a revolution which turned

13     into a country run by religious figures with sort of a puppet

14     government.  Hardly argue that it's democratically elected

15     government that's representative of the people.

16             And during that early time and moving up through the

17     1990s and into the 2000s you will hear about the activities of

18     Mr. Olangian's family and Mr. Olangian.  You will learn that

19     both his brother and mother ultimately died in good substantial

20     part -- "good" is a bad word to use -- from injuries they

21     suffered years before as a result of beatings and stabbings by

22     the government, the government of Iran and its agents.

23             And you will hear that at some point Mr. Olangian's

24     family had enough resources to send him to the United States to

25     complete his education.  And he went to school here in the

United States, college, graduate degree engineering as, at the
time, did many young Iranian students.  The relationship
between the United States and Iran was somewhat different
during that period of time and so Iranian students came to the
United States.

They were permitted here on student visas to study in
the United States.  Many of them eventually stayed in the
United States, applied to be resident aliens and then applied
to be and become United States citizens.  Reza Olangian is one
of those people.  He studied in Illinois.  He studied in
Indiana.  And while he was in school he participated in student
organizations regarding his country at that time where his
citizenship was before he became a U.S. citizen, the country of
Iran, groups that were formed by the students of Iran who were
opposed to the policy Iran.  And there's a long history of that
up to the current day.

We don't hear about it here all the time.  With all
the social media we have we don't always hear about what's
going on around the world particularly in countries where
information is suppressed, people are oppressed and the
information is not released.  But he participated in these
organizations that had protests and demonstrations all directed
at policies of the government of Iran.  He graduated school.
He married.  He had two children who are American citizens.  He
got jobs.  He worked as an engineer.

1        When you heard the list of places earlier today that
2   the judge read off there was a whole series of places all
3   around the world and then the last place was Los Gatos,
4   California.  That's where he lived with his family.  He was
5   working.  His wife was working.  His two sons were going to
6   school.  But always in his life there was a tug back to Iran to
7   do something about the way that government operated, to do
8   something for his family members who had been beaten and
9   arrested and tortured.  And eventually he returned to Iran at a
10  time when it appeared that Iran might stabilize a little more,
11  become a little more democratic, small "d", that the government
12  may be more open, that people would be freer.  He went back to
13  Iran.  He started a business in Iran and as he was doing that.
14  He became involved in the politics in Iran again, opposing
15  policies of the government because when he first went back it
16  appeared that there was going to be a change for the better.
17  That's not what happened.

18       There were elections, the more moderate president or
19  candidates were not re-elected.  A fellow by the name of
20  Ahmadinejad was elected president of Iran and that country
21  turned back inward away from the world, repressing its people,
22  causing economic sanctions to be placed upon it and those
23  economic sanctions have deeply affected the people, their
24  businesses, their livelihood.  And what came along with that
25  was the fear and the power of the government.

1    And he was there during that period and he continued

2    and renewed his activities.  He was in the streets

3    demonstrating, particularly, with a group called the Green

4    Movement, not the Green Party in the United States but the

5    Green Movement and you will hear about that.  Demonstration

6    after demonstration after demonstration, tens of thousands of

7    people, millions of people, no change in the government.  What

8    did it result in?  Arrests, beatings, tortures, disappearances.

9    But he continued to do that.  And at some point the pressure

10   was too much from the government and the movement started to

11   fall apart.  People were scared, hurt.  Reza Olangian started

12   to do other things to try to bring to the attention of other

13   countries what the Iranian government was really doing and was

14   really like if it wasn't already known.  And he engaged people

15   inside Iran and outside Iran in Tajikistan and other countries

16   to try to see who were sellers of equipment illegal, Iglas,

17   aircraft parts, many other things and then see in Iran if he

18   could get someone associated with the Iranian government to

19   bite and say we want to buy these things.  See if you can set

20   up a deal.

21            MR. STANSBURY:  Objection, your Honor.

22            THE COURT:  I know you are cognizant, Mr. Ginsberg, of

23   the conversions we've had.

24            MR. GINSBERG:  I know it all runs afoul of it.

25            THE COURT:  Remember, ladies and gentlemen, that

1   nothing any of the lawyers say is evidence.  The only evidence

2   comes from the witnesses and the exhibits and then you are

3   guided by the Court's instructions.

4            MR. GINSBERG:  You will hear this testimony from the

5   witness stand.  It's not just that I'm standing here telling it

6   to you now.  You will hear it and you will have the opportunity

7   as the judges of the fact to judge it.

8            You heard the government talk about all these various

9   potential transactions, tried to get this, tried to get that.

10  It's always tried to because nothing ever happened.  From

11  2007/2008 through the time of his arrest there were no deals

12  completed because it was never Reza Olangian's intention to

13  allow the deal to be completed or the transaction to be

14  completed or to conspire to actually do it.  It was his desire

15  to get the Iranian government on the hook on a contract, on a

16  piece of paper that would definitively show what they were

17  trying to do.

18            Now, you may be sitting there right now thinking to

19  yourself, that's pretty farfetched.  But you know we live in a

20  country where a lot of things that we see around the world

21  never happen.  Unfortunately, the more recent years we have

22  been touched by things that we never thought would happen here.

23  But there are places in the world and countries where

24  repression is constant, where the people are constantly

25  fighting their own government literally, fighting their own

government for their own view of democracy and freedom.  It's
hard sometimes to put yourself in that position and understand
that.

          You will hear from an expert witness who has testified
as an expert many times before, and almost always on behalf of
the government about the politics and social history of Iran so
you can better understand the background that we're dealing
with here and you will learn why none of these things happened.
But you will see how persistent Reza Olangian was to try to put
the Iranian government in the position he wanted them in and
that is to be exposed to their own people and the world for
what they were all about.  It became clearer to everybody as
Mr. Ahmadinejad began to speak around the world and at the UN
and say some of the things that he said, there was no doubt
what he was representing and who he was representing.

          But Mr. Olangian had his part and there were others
too, not just him.  And you will hear that his wife -- he
separated eventually from his wife who lived in the United
States with his two children because he went back to Iran and
for various reasons which you'll hear about, the marriage fell
apart and he married again.  And the woman he married again
agreed with his political views and assisted him in many of the
things that he was doing and you'll hear about that.  And you
may see or hear, I don't know, tapes, calls, e-mails but
eventually he does have these video/audio-taped conversations.

1    Yes, he didn't know they were being taped but he had them for

2    the reasons that I've explained and you'll hear.  And there

3    were Skype sessions and there were the e-mails and telephone

4    calls and then he gets arrested.

5          And when he gets arrested in Estonia, rather than sit

6    there and say nothing, he asks to speak to the United States

7    representatives because he was arrested at first by the

8    Estonians.  And when he speaks to the United States

9    representatives he has in his mind one major thing and that is

10   he's been arrested, his wife has assisted him in some of these

11   things.  She is in big danger and exposed.  And he speaks to

12   the agent and tells them mean things which you'll hear which

13   were written out in and turned into reports which we're not

14   contesting.  But he arranges with the agents to be able to

15   speak to his wife and to be able to get her to some degree of

16   safety and continues to talk to the agents and tells them a

17   story which is not completely true.

18         But what he also does is he reaches out to his wife

19   and asks his wife to send him documents about the things he was

20   doing.  And not only did he do that when he was in Estonia but

21   he is then brought to the United States to come into the United

22   States court system and he again asks to meet with the

23   government.  And his lawyers turnover to the government various

24   documents including contracts that purport to be contracts that

25   would agree, if he wanted to go forward with it, to sell and

1    buy these various weapons, given to the government by his own

2    lawyers, not afraid to do that.  Not something you're going to

3    do if you're guilty and you're going to turnover all the

4    evidence.

5              MR. STANSBURY:  Objection, your Honor.

6              THE COURT:  Counsel knows not to vouch for what a

7    client --

8              MR. GINSBERG:  You can judge for yourselves what you

9    think somebody would do under those circumstances.  You will

10   hear his testimony.  You'll be the judges of the facts and it

11   is critically important that you keep an open mind because it

12   would be far too easy having heard the opening statement and

13   you are going to hear very soon -- well, Wednesday -- testimony

14   from an agent who has an overview of the whole case who is what

15   they refer to as the case agent, testimony from Max, audios,

16   videos.  Keep an open mind through all of that because there's

17   more to come.

18             When you have all of the information and you have all

19   of the facts then you can arrive at a fair verdict.  If you

20   keep an open mind and you're fair and impartial and don't jump

21   to conclusions which we know that you'll be able to follow and

22   do because of what you've told us here today, you will hear

23   from me I guess whether you like it or not.  I hope you like

24   it.  But during my cross-examinations I have an opportunity to

25   speak to the witness and then at the end of the case in the

1   summation.

2          But it will be you, ladies and gentlemen, the

3   Constitution that makes a determination as to whether or not

4   the government has proven its case beyond a reasonable doubt

5   and proven the willfulness or intention of Reza Olangian to

6   break the law, which I suggest to you when you've heard all the

7   evidence you will not find that he did.

8          Thank you very much.

9          THE COURT:  Thank you, Mr. Ginsberg.

10          Ladies and gentlemen, we will break for the day today.

11   Please remember your instructions not to discuss the case among

12   yourselves or with anyone else and not to do research.  We

13   would like to be ready to start promptly at ten o'clock on

14   Wednesday.  There will be coffee for you in the jury room at

15   9:30.  Remember, you need to get into the building through

16   securities and you also want to drink your coffee before you

17   come out in the courtroom.  So plan to get here a little early.

18   I know some of you come from Putnam.  It'll take a little

19   longer.  So try your best to get here so that people don't have

20   to wait and we can complete our work in a timely manner.

21          Thank you for your attention today, ladies and

22   gentlemen.  Have a good day tomorrow.  I look forward to seeing

23   you Wednesday morning.

24          (Jury not present)

25          THE COURT:  Counsel, is there anything further on the

GB7AAOLA2                    Ginsberg – Opening Statement

1  record?

2          MR. STANSBURY:  Your Honor, just one thing.  I think

3  in light of the defense's opening, we will likely be wanting to

4  propose a revision to our limiting instruction.  We can address

5  that at the appropriate time but I have just want to flag it

6  for your Honor.

7          THE COURT:  Of course.  Anything else on the record?

8          MR. STANSBURY:  No, your Honor.

9          THE COURT:  Off the record.

10         (Adjourned to Wednesday, November 9, 2016 at ten p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25