UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X

UNITED STATES OF AMERICA

                -against-                      12 Cr. 798 (LAP)

REZA OLANGIAN,

                      Defendant.

------------------------------------------------------------- X

## SENTENCING MEMORANDUM OF REZA OLANGIAN

ORRICK HERRINGTON & SUTCLIFFE LLP

51 W. 52nd Street
New York, NY 10019
Tel: (212) 506-3552

*Attorneys for Defendant Reza Olangian*

## PRELIMINARY STATEMENT

Defendant Reza Olangian respectfully submits this memorandum in aid of his sentencing. Although the Presentence Report ("PSR") includes a description of Mr. Olangian's background, we submit this memorandum to provide additional details so that the Court will have a fully nuanced picture of Mr. Olangian when it imposes its sentence on him. For all the reasons stated herein, Mr. Olangian respectfully submits the Court should impose a non-Guidelines sentence.

## STATEMENT OF FACTS[1]

### A.   Mr. Olangian's Personal History

Mr. Olangian is a 56 year old, Iranian born U.S. citizen. See Trial Transcript ("Tr. T.") 11/17/16 at p. 871, lines 9-11. He has three sisters, and a brother who died in 2009. See id. at 872, 4-10. Mr. Olangian has two sons, Bashir (30) and Nazir (29), from his first marriage. See id. 871, 21-22. He is a loving father and very close to his sons.

In 1979, at age 18, Mr. Olangian left Iran and came to the United States. See id. at 878, 9-13. He came on a student visa and attended Illinois University at Carbondale and University of Illinois at Urbana-Champaign. See id. at 18-25. Mr. Olangian received a bachelor's degree in electrical engineering and a master's of science in applied mathematics. See id. at 880, 4-7. In 1983, while in Illinois, Mr. Olangian married Farah Gharaei and they had two children. Mr. Olangian continued his studies in the United States at both North Carolina State University (where he studied electrical engineering) and SUNY Stonybrook, where he obtained a PhD in electrical engineering. See id. at 881, 16-24.

---

[1] For purposes of this sentencing memorandum, defendant does not dispute the jury's verdict and counsel intends to make no argument designed to impeach the jury's verdict. However, because Mr. Olangian intends to pursue his appellate rights, nothing contained herein should be construed as an admission by Mr. Olangian of any factual finding made by the jury with respect to Mr. Olangian's guilt and nothing contained herein should be construed as a waiver of any appellate arguments of Mr. Olangian.

From approximately 1987 through 2007, Mr. Olangian went on to hold numerous jobs while living in the United States. See id. at 882-888 (software and algorithm engineer at Fonr; software and coding engineer at PBG Biomedical Center; several start-ups in Silicon Valley: Prometrics, Electroglass, JTS Hard Drive, and Applied Materials). In 1998, Mr. Olangian established his own consulting company, Rezware. See id. at 889, 15-22.

In the late 1980s, Mr. Olangian applied for a Resident Alien Card (commonly referred to as a "green card"). See id. at 882, 23-25. In January 1995, Mr. Olangian applied for United States citizenship. He went through a four-year approval process – including interviews, an exam and a thorough background check – and on January 5, 1999, Mr. Olangian became a United States citizen. See id. at 883, 21-24. Annexed hereto as Exhibit A is a copy of Mr. Olangian's Certificate of Naturalization.

Over the first 17 years Mr. Olangian lived in the United States, he only returned to Iran on a few occasions. The first time he returned was in the summer of 1983. He had learned his parents were facing increased harassment for their anti-Iranian government activism and he returned to help ensure their safety. Annexed hereto as Exhibit B is a page from Mr. Olangian's U.S. Citizenship and Immigration Services Alien File ("A-File") regarding this trip back to Iran. In or around 1996, he began to return to Iran in the summer times. See Tr. T. at 890-1. His parents were aging, and he wanted to spend more time with his family in Iran.

In 2004, Mr. Olangian returned to Iran to live. As the first born, he felt a responsibility to care for his aging parents. His mother had recently become ill, and his brother was sick as well. Also, at that time, President Khatami led the country and Mr. Olangian believed things were getting better in Iran, and that it would be a good time to return. See id. at 891, 18-24.

2

His wife, Farah Gharaei, and children remained in the United States. His sons were both in high school and had plans to attend colleges in the United States, so Mr. Olangian felt it was best for his wife and children to stay and not move with him at that time. While Mr. Olangian and his wife later divorced in 2010, they remain good friends and supportive of one another. As part of their divorce, Mr. Olangian transferred the deed of the family home in California to his wife's name.

While in Iran, Mr. Olangian started an electronic company called Azad Farad. See id. at 892, 20-24. Annexed hereto as Exhibit C is a copy of Mr. Olangian's business card. The company employed two full-time engineers, a secretary and another assistant who worked part-time. See Tr. T. at 893, 2-3. Annexed hereto as Exhibit D are pictures of the office as well as some of Azad Farad's employees. Azad Farad developed its own products, including entry access control hardware for buildings, an irrigation controller and software to distribute commercials on television monitors found in small businesses or malls. See id. at 893-4. Annexed hereto as Exhibit E is a copy of a brochure for the irrigation controller developed by Azad Farad.

As discussed above, although Mr. Olangian relocated to Iran, his wife and children stayed in the United States. However, Mr. Olangian never lost touch with his sons, and they remain an important part of his life. Indeed, they saw one another, usually during the winter holiday season and summers. See id. at 898, 22-25. Annexed hereto as Exhibit F are pictures of Mr. Olangian visiting with his sons during the holiday season. In 2010, Mr. Olangian traveled back to the United States for his son Nazir's graduation from the University of Puget Sound in Tacoma, Washington. Annexed hereto as Exhibit G is a collage of photographs from the graduation. Mr. Olangian's sons also visited him in Iran. Annexed hereto as Exhibit H are photographs from a

2010 visit by Nazir and Bashit to Iran. In 2011, Mr. Olangian attended the graduation of his older son, Bashir, from the University of San Francisco. Annexed hereto as Exhibit I is a photograph of Bashir at his graduation.

In 2007, Mr. Olangian hired Baneafash Abol-Masoumi, as a temporary secretary for his company Azad Farad. She later became a permanent employee who handled marketing. Mr. Olangian and Ms. Abol-Masoumi later began a romantic relationship and married in 2011, after his divorce from his first wife.

After his arrest, Ms. Abol-Masoumi visited Mr. Olangian in Estonia, and then traveled to the United States where she initially stayed in California with Mr. Olangian's ex-wife and sons. She then traveled with one of Mr. Olangian's sons to visit Mr. Olangian at the Metropolitan Correctional Center ("MCC") in Manhattan. Mr. Olangian gave Ms. Abol-Masoumi power of attorney over all of his property and assets, so that she could raise funds for him to hire an attorney. However, after several months their relationship began to deteriorate. Mr. Olangian believes that her family pressured her to distance herself from Mr. Olangian, in part to ensure her safety. The two ultimately ceased having contact and Mr. Olangian believes she took all his money and property in Iran for herself.

In September 2010, Mr. Olangian's mother passed away. Annexed hereto as Exhibit J are photographs from the funeral. In 2014, while incarcerated in this instant case, Mr. Olangian's father died.

1. **Opposition to Iranian Government**

Long before Mr. Olangian's birth, his mother joined organizations that opposed the oppressive Iranian government. See Tr. T. at 872-3. As a young woman, police arrested her for opposing the shah. See id. at 873, lines 3-4. Other members of Mr. Olangian's family also

opposed the shah and suffered consequences. In particular, in 1984, Mr. Olangian's high school

aged brother, Ali, became a target of the Iranian government. Two militia members arrived at the

Olangian residence to speak with Ali. See id. at 875-6. Mr. Olangian testified in detail about the

incident:

> A: … My mother runs to the room that my brother was in,
> opens the door, and sees my brother on the floor, one of them
> holding his hand, and the other one was stabbing him
> repeatedly.
>     My mother, seeing that scene, jumps on my brother, and
> she gets repeatedly stabbed. My sisters are screaming. They
> run to the street asking for help, and the two assailants
> escape.
>
> Q. What kind of injuries did your brother and mother suffer as
> a result of this?
>
> …
>
> A: There were more than 10 or 15 stabbing wounds all over their
> frontal, lung, kidney, under arm, hand, and the same thing on both
> of them.

Id. at 876-7. Annexed hereto as Exhibit K is a medical report relating to the incident and injuries

sustained by Mr. Olangian's brother, Ali.[2] Doctors repaired the extensive damage to Ali's

stomach, chest and liver. See id. Mr. Olangian testified that his brother died in 2009, as a result

of lingering complications from these extensive injuries. See Tr. T. at 877-8.

    While attending university in the United States, Mr. Olangian joined a student association

that included "Iranian students in the United States … [with] aspirations of having the same

freedom that [they] enjoyed [in the United States] be available to Iran[]." Id. at 880, 16-20. Mr.

Olangian participated as an active member for several years, but slowly grew less hopeful and

minimized his participation because the Iranian revolution continued and the regime became

more and more oppressive. See id. at 880-1.

---

[2] These documents are part of Mr. Olangian's A-File.

While living and working in the United States in the 1980s and 1990s, Mr. Olangian watched from afar as the Revolution happened. He had hoped for the best for Iran, but ended up seeing the worst.  He "wanted just like any other Iranian, [he] had the same aspiration [of] freedom for [Iran], be equal under the eyes of the law. No exception if you are from the royal family or from the villagers, law would be equally applied to everyone. … So I was in that movement but when the Revolution happened in about two or three years it just went belly up and we had another group of people who were in control and the same thing that was happening at the time of the shah is still happening." Id. at 887, lines 7-15.

Shortly after Mr. Olangian returned to Iran in 2004, Mahmoud Ahmadinejad became the President of Iran. This changed Iran for the worse. Where once, Mr. Olangian saw a future of hope and tolerance for Iran, he no longer believed in such a future.  Mr. Olangian testified that "all the openings that were presented to Iranian[s] in the last eight years of President Khatami one by one were taken from the Iranian people." Id. at 896, 13-15.

This restriction of freedom caused Mr. Olangian to become politically active in opposition to the Iranian government. See id. at 896-7. The social environment became oppressive and police presence in the streets increased. Ms. Abol-Masoumi had been a journalist in Iran and had many anti-government contacts whom she introduced to Mr. Olangian. In 2007, Mr. Olangian assembled a secret group of people who met and discussed ways to counter and stop the oppressive government. See id. at 897-8. They themselves took part in demonstrations, wrote articles and produced videos that were widely viewed on YouTube (one video has over four million views).

Mr. Olangian and Ms. Abol-Masoumi were subjected to harassment and retribution for their peaceful protests against the Iranian government. In fact, they were often on the receiving

6

end of abuse by the militia after the uprising in 2009. On one occasion, from inside their car they were filming the police harassing and beating individuals and the police came over to their car and began damaging the vehicle insisting that they give the police the camera. On other occasions, Mr. Olangian got into scuffles with the police defending a young man or woman he felt was being wrongly targeted and harassed. See id. at 897, lines 4-10. He was sprayed with mace and beaten by the militia. During one particular peaceful protest in Tehran, Mr. Olangian's wrist was broken and his skull cracked. During the winter of 2009, when Mr. Olangian was visiting his sons in the United States, Ms. Abol-Masoumi was beaten by the militia.

At a certain point, Mr. Olangian considered leaving Iran and returning to the United States. But his brother had become very ill, and he met Ms. Abol-Masoumi, who had introduced him to likeminded people, so he felt he had an opportunity to maybe make a difference in Iran.

**B.**    **Mr. Olangian's Arrest and Imprisonment in Estonia**

On October 10, 2012, Estonian National Criminal Police arrested Mr. Olangian in Tallinn, Estonia pursuant to a provisional arrest warrant. While awaiting extradition to the United States, Mr. Olangian spent five and one half months (167 days) in harsh conditions in an Estonian prison.

The conditions were abysmal. He was in a small cell with five other inmates, many of whom had serious illnesses, including AIDS and Hepatitis. The inmates were locked in their cells 23 hours a day, and for one hour moved to another tiny cell with a view of the outside through the roof. There were no toilets in the cells and the inmates were forced to relieve themselves in a hole.

Mr. Olangian was given a small steel bowl, spoon and cup from which to eat out of, but they were extremely dirty. The food was meager and barely edible. When Mr. Olangian was first

arrested he weighed approximately 175 pounds. At one point, while incarcerated in Estonian, he was down to 130 pounds. He was not allowed any social phones call, and no access to newspapers or radio. If lucky, the inmates were permitted to shower once a week, and were forced to do so together at the same time. The other inmates sexually taunted Mr. Olangian during these times.

Mr. Olangian was regularly subject to beatings by the other inmates. He made numerous trips to the infirmary, and was beaten unconscious on at least four occasions. One time he was beaten so badly an ultrasound revealed internal bleeding. An attorney in Estonia made a request for Mr. Olangian's medical records, but that request was denied. Mr. Olangian did not think he was going to leave Estonia alive.

In 2013, the U.S. State Department issued "Estonia 2013 Human Rights Report" ("Estonia Report"). A copy is annexed hereto at Exhibit L, and can also be found at https://www.state.gov/documents/organization/220486.pdf. The Estonia Report found:

> In the course of inspection visits to a number of institutions, the legal chancellor (the country's ombudsman) found a number of deficiencies in prison and detention center conditions, particularly in detention centers where officials held detainees for short periods. Among them were deficiencies in the availability of medical care and fire safety in several facilities. *The continuing use of a Soviet-era prison in Tallinn for a large number of prisoners remained a problem*, although the government was in the process of phasing out this facility. In this institution recreational facilities were few and in poor condition. The legal chancellor reported that inmates did not have sufficient access to legal documentation in prisons and detention centers and there was a shortage of telephones they could use to contact family members.

Id. at 2 (emphasis added).

For five and a half months, Mr. Olangian lived in a prison that did not meet the acceptable standards for any facility in the United States run by the Bureau of Prisons.

**C.**   **Mr. Olangian's Incarceration at the MCC**

Mr. Olangian has been an inmate at the Metropolitan Correctional Center ("MCC") since March 26, 2013. Since that time he has had zero infractions, and has been a model prisoner. Indeed, he is currently the longest serving tutor to those studying for their GED. Annexed hereto as Exhibit M are various Certificates from the MCC reflecting Mr. Olangian's contributions as a Unit Literacy Tutor.





## ARGUMENT

## THE COURT SHOULD IMPOSE
## A NON-GUIDELINES SENTENCE

A.     **Offense Conduct and Guidelines Range**

After a ten day trial in the Southern District of New York a jury convicted Mr. Olangian.

The jury returned a guilty verdict for conspiracy to acquire and transfer anti-aircraft missiles in

violation of 18 U.S.C. §§ 2332g(a)(1), (b)(2) and (c)(1), attempt to acquire and transfer anti-

aircraft missiles in violation of 18 U.S.C. §§ 2332g(a)(1), (b)(2) and (c)(1), conspiracy to violate

---

[3] Mr. Olangian initially consented to extradition but when he learned that his wife might be in danger, he fought extradition to see if he could ensure her safety. After she arrived in Estonia, Mr. Olangian signed the forms consenting to his extradition.

the International Emergency Economic Powers Act in violation of 50 U.S.C. §§ 1750 and 3238, and attempt to violate the International Emergency Economic Powers Act in violation of 50 U.S.C. §§ 1750 and 3238. The two counts pursuant to 18 U.S.C. §§ 2332g provide for a mandatory term of imprisonment of 25 years. The Probation Department estimates Mr. Olangian's applicable guideline range is life. This is Mr. Olangian's first and only criminal conviction.

**B.**      **<u>Sentencing Analysis</u>**

As this Court well knows, <u>United States v. Booker</u> rendered the Sentencing Guidelines advisory and not mandatory. 543 U.S. 220, 223 (2005). That same year, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines…to 'consider' them, along with the other factors listed in section 3553(a)." <u>United States v. Crosby</u>, 397 F.3d 103, 111 (2d Cir. 2005).

It is axiomatic that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." <u>Peugh v. United States</u>, 133 S. Ct. 2072 (2013) (<u>citing</u> <u>Gall v. United States</u>, 552 U.S. 38, 51 (2007)). Once the court has correctly calculated the Sentencing Guidelines, it must determine a reasonable sentence based on § 3553(a) factors. <u>See</u> <u>Gall</u>, 552 U.S. at 39. Section 3553(a) of Title 18 of the United States Code provides that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes [of sentencing]." 18 U.S.C. §3553(a); <u>see also</u> <u>United States v. Stewart</u>, 590 F.3d 93, n.17 (2d Cir. 2009).

In other words, the Guidelines are merely one part of the sentencing process; courts should pronounce individualized sentences to the specific defendant in each case. "It has been

uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Koon v. United States, 518 U.S. 81, 113 (1996).

In the instant case, Mr. Olangian respectfully requests that the Court grant a downward departure and a non-guidelines sentence based on the below discussed factors.

## C.   A Downward Departure For Time in Estonian Prison and Conditions at the MCC

Mr. Olangian respectfully submits that a downward departure is appropriate given the harsh environment of the prison in Estonia, as well as his almost five years in the MCC.

Pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures from sentencing guidelines. See United States v. Carty, 264 F.3d 191 (2d Cir. 2001) (per curiam) (holding that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures."); see also United States v. Francis, 129 F. Supp. 2d 612, 619 (S.D.N.Y. 2001) (departing downward based on defendant's thirteen and one-half month pretrial detention at a state facility where he suffered severe physical and psychological trauma "under qualitatively different conditions than those of pre-sentence detainees in federal facilities operated by the Bureau of Prisons").

In the instant case, the conditions in the Estonian prison were abysmal and below the standards for any pre-trial federal detention facility in the United States. Mr. Olangian's only toilet was a hole in the ground. The food was virtually inedible and he lost substantial weight. He was denied telephone calls to family members. He was subject to such brutal physical abuse that he was left unconscious on several occasions.

It is undeniable that the conditions to which he was exposed for five plus months were qualitatively different than those of pre-sentence detainees in federal facilities operated by the Bureau of Prisons. Indeed, as discussed above, in 2013, the U.S. State Department issued a report noting a number of deficiencies in Estonian prisons. See Exhibit L.

Moreover, Mr. Olangian has been incarcerated in the MCC since March 26, 2013. At the time of his sentence, he will have been at the MCC for just under five years. Access to fresh air is limited, and even cut off for days at a time when the elevators do not work. Courts have considered the harsh conditions of the MCC in particular when sentencing defendants. See, e.g., United States v. Behr, 2006 WL 1586563, *5 (S.D.N.Y. June 9, 2006) (taking into consideration the "harsh conditions of the MCC" when sentencing the defendant). It has been particularly difficult for Mr. Olangian given his medical ailment, ulcerative colitis. During a flare up (which can occur without any notice), a restricted diet is important, and yet, often difficult to adhere to while incarcerated at the MCC.

Mr. Olangian respectfully requests that the Court consider both in the inhuman conditions in the Estonian prison and the length of time he has endured the MCC when imposing a sentence. Further, he respectfully requests that the Court indicate on the Judgment that Mr. Olangian receive credit for the 162 days in the incarcerated in Estonia.







███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████

**E.**     **A Review of the Section 3553 Factors Weighs in Favor of a Non-Guidelines Sentence**

Title 18 U.S.C. § 3553 provides that the Court should impose "a sentence sufficient but not greater than necessary" to provide just punishment for the defendant, and requires the Court to consider "the nature and circumstances of the offense and history and characteristics of the defendant." Pursuant to 18 U.S.C. § 3553, the Court must also consider the need for the sentence it imposes "to reflect the seriousness of the offense, [and] to promote respect for the law." 18 U.S.C. § 3553(a)(1) and (2)(A). These sections of the Code direct the Court to consider the defendant and his actions holistically, and to "provide just punishment for the offense" in light of all the facts known to the Court.

      **1.**   **The need of the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"**

While the convicted offenses are serious, a sentence of life imprisonment is not warranted in the instant case. This is Mr. Olangian's first ever offense. Given Mr. Olangian's age and lack of criminal history, a life sentence is greater than necessary to reflect the seriousness of the offense and provide just punishment. Indeed, as discussed in detail below, a sentence of a 25 year prison term (the mandatory minimum) appropriately reflects the seriousness of the offense and provides just punishment.

2. **The need of the sentence imposed to "afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant"**

In determining the particular sentence imposed the court shall consider the need of the sentence imposed to "afford adequate deterrence from criminal conduct" and "protect the public from further crimes of the defendant." 18 U.S.C. §§ 3553(a)(2)(B) & (C). These factors focus on specific and general deterrence.

With respect to general deterrence, a 25 year prison term will provide adequate general deterrence to the criminal conduct of others similarly situated to Mr. Olangian.

With respect to specific deterrence, this is Mr. Olangian's first ever conviction. There is no dispute that it is a serious offense, but a term of imprisonment less than life will provide sufficient *specific* deterrence to Mr. Olangian.

In addition, Mr. Olangian notes that the effectiveness of harsh sentences as "general deterrents" is questionable. Social science appears to undermine the notion that lengthy sentences will deter others from committing similar crimes. Specially, it has been noted that "potential criminals ... do not believe [that] they will be apprehended and convicted," and therefore they do not "consider sentence consequences in the matter one might expect of rational decision makers." Amy Baron-Evans, Sentencing by the Statute, 7-9 (Apr. 27, 2009, revised Dec. 21, 2010) (citing Michael Tonry, Purposes and Functions of Sentencing, 34 Crime and Justice: A Review of Research 28-29 (2006)), a copy can be found at https://nyn.fd.org/content/sentencing-statute-amy-baron-evans-2009. "[R]esearch on the personality of known offenders portrays them as impulsive, impatient, easily distracted, narrowly focused on the short- term consequences of their actions and biased towards behaviors that are

immediately gratifying, regardless of the long-term risks." Gary Kleck, et al., The Missing Link in General Deterrence Research, 43 CRIMINOLOGY 637 (2005).

Empirical evidence demonstrates that actual punishment levels, measured in terms of certainty, severity, and celerity, have no effect on perceived punishment levels on the part of criminals and non-criminals alike. See id. at 644, 647, 650. Although the "punishment-generating activities of the criminal justice system" may produce some "baseline deterrence effect," there is no indication that deterrence is influenced by either an increase or a decrease in punishment levels. See id. at 653; see also Raymond Paternoster, How Much Do We Really Know About Criminal Deterrence? 100 J. CRIM. L. & CRIMINOLOGY 765, 804-05, (2010). Because there is no evidence to suggest that sentencing Mr. Olangian to a more severe punishment will lead to a reduction of crime through general deterrence mechanisms, and there is evidence to suggest that no deterrent effects will be lost if Mr. Olangian is sentenced to the mandatory minimum, consideration of 18 U.S.C. § 3553(a)(2)(B) weighs against a life sentence. See Kleck, at 655.

### 3.  The personal history and characteristics of Mr. Olangian

The Court may consider a defendant's personal history and characteristics when determining a reasonable sentence. See Section 3553(a)(1). "Matters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, lack of guidance as a youth, family ties, or military, civic, charitable, or public service are not ordinarily considered under the Guidelines. These are, however, matters that § 3553(a) authorizes the sentencing judge to consider." Rita v. United States, 551 U.S. 338, 364 (2007) (citations omitted).

Mr. Olangian's personal history and characteristics as set forth above, demonstrate that leniency is appropriate in the instant case. His childhood in Iran was particularly harsh. His brother and mother were stabbed by militia men. His brother was so seriously injured, that complications from the attack caused his pre-mature death at the age of 43.

Mr. Olangian was routinely subjected to violence and degradation while living in Iran. Even after returning to Iran as an adult, he was targeted because of his peaceful protests. He was beaten and targeted by the Iranian militia. He got into altercations with the police defending a young man or woman he felt was being wrongly targeted and harassed. Mr. Olangian may not be the only person who has experienced such personal hardship during his life, but his personal history should factor into his sentence.



In light of the foregoing, Mr. Olangian respectfully requests that the Court consider Mr. Olangian's life, the difficulties he has faced, ████████████████████, when fashioning an appropriate sentence.

### 4.  The need to "avoid unwarranted sentence disparities"

Title 18 U.S.C. § 3553(a)(6) describes "the need to avoid *unwarranted sentence disparities* among defendants with similar records who have been found guilty of similar conduct." (Emphasis added).

A sentence of the mandatory minimum in this case would be entirely consistent with the sentences imposed in this district for the same, and even more serious, charges. See, e.g., United States v. Pouryan, 628 Fed. Appx. 18, *20 (2d Cir. 2015) (defendants convicted at bench trial of providing material support to terrorist and conspiring to acquire anti-aircraft missiles in violation of 18 U.S.C. §§ 2339A, 2332g and 3238, sentenced to concurrent terms of imprisonment of 15 and 25 years); Moreno-Godoy v. United States, 2014 WL 1088300, *1 (S.D.N.Y. March 20, 2014) (300 months incarceration following conviction at jury trial for conspiracy to kill United States nationals (18 U.S.C. §§ 2332(b), 3238); conspiracy to kill officers and employees of the United States (18 U.S.C. §§ 1114, 1117, 3238); conspiracy to acquire and use anti-aircraft missiles (18 U.S.C. §§ 2332g(a)(1), 2332g(b) (4), 3238); conspiracy to provide material support or resources to designated foreign terrorist organizations (18 U.S.C. §§ 233913(a) (1), 233913(d)(1)(E), 3238); and money laundering (18 U.S.C. § 1956(a)(3))); United States v. Cromitie, 727 F.3d 194, 204 (2d Cir. 2013) (25-year mandatory minimum sentence for defendants convicted at trial of 18 U.S.C. § 2332g and conspiracy to kill U.S. officers and/or employees in violation of 18 U.S.C. §§ 1114, 1117 ); United States v. Bout, 731 F.3d 233, 237 (2d Cir. 2012) (after jury trial defendant sentenced to concurrent terms of 180 months' imprisonment on Counts One (18 U.S.C. § 2332(b)), Two (18 U.S.C. §§ 1114 and 1117), and Four (18 U.S.C. § 2339B), and 300 months' imprisonment on Count Three (conspiracy to acquire and export a missile system designed to destroy aircraft, in violation of 18 U.S.C. § 2332g, where Guidelines were life); United States v. Al Kassar, 660 F.3d 108, 117 (2d Cir. 2011) (defendants Al Kassar and Godyo were convicted at trial of five counts, including 18 U.S.C. § 2332g, conspiracy to kill U.S. officers and/or employees in violation of

§§ 1114, 1117 and conspiracy to provide material support to a known terrorist organization in violation of 18 U.S.C. § 2339B, and sentenced to 30 years and 25 years, respectively).

Notably, in cases where, in addition to a conviction pursuant to 18 U.S.C. § 2332g, the defendant was also convicted of conspiracy to kill U.S. officers and/or employees in violation of 18 U.S.C. §§ 1114, 1117, the defendant received the mandatory minimum. Indeed, in some of the above cited cases, the courts imposed non-Guidelines sentences despite the fact that the defendants were known to be long-time weapons dealers.

For example, in United States v. Bout the Second Circuit wrote Viktor "Bout has long been regarded by the United States government as a dangerous and powerful international arms trafficker, and his illicit pipeline has repeatedly been designated for sanctions by the United States and United Nations authorities." See Bout, 731 F.3d at 236 (Bout was sentenced to 25 years). Likewise, in United States v. Al Kassar, Monezar al Kassar had been suspected by the U.S. government to be illegal arms trafficker since the 1970s. See Al Kassar, 660 F.3d at 115 (Al Kassar was sentenced to 30 years). Here, Mr. Olangian did not sell illegal arms, nor is he alleged to be decades-long arms trafficker. The jury convicted him of participating in a six-month long conspiracy. The differences are notable.

Mr. Olangian respectfully submits that a Guidelines sentence in this case would result in an "unwarranted sentence disparity." Therefore, consideration of this factor also suggests that a below Guidelines sentence is appropriate in Mr. Olangian's case. As is indicated by the foregoing analysis, the various relevant factors set forth in Title 18 United States Code Section 3553(a) all weigh in favor of a below Guidelines sentence.

**F.**     <u>**The Court Should Decline to Apply an Enhancement for Obstruction of Justice**</u>

The PSR provides that the "probation office defers to the Court as to whether a two-level enhancement for Obstruction of Justice, under § 3C1.1, is applicable." PSR at ¶ 97. It is respectfully submitted that the Court should decline to impose an obstruction of justice enhancement as to Mr. Olangian's trial testimony. Mr. Olangian submits that his testimony was consistent with the evidence the defense proffered, as well as Mr. Olangian's prior statement to the government regarding his conduct. It is submitted the Mr. Olangian did not commit perjury. <u>See</u> <u>United States v. Thompson</u>, 808 F.3d 190, (2d Cir. 2015) (holding that in order to impose enhancement under § 3C1.1 district court must review evidence and make independent findings necessary to establish a willful impediment to obstruct justice under the perjury definition, that is "to impose an obstruction-of-justice adjustment, the court must make a finding of specific intent.") (quotations and citation omitted).

## **CONCLUSION**

For all the foregoing reasons, Reza Olangian respectfully requests that the Court impose a below Guidelines sentence on him.

Dated:  New York, New York
        January 24, 2018

ORRICK HERRINGTON & SUTCLIFFE LLP

By:      _____/s/_____
        Gregory Morvillo
        51 W. 52nd Street
        New York, NY 10019
        Tel: (212) 506-3552

*Attorneys for Defendant Reza Olangian*