UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>-against-<br><br>REZA OLANGIAN,<br><br>                Defendant. | 12 Cr. 798 (LAP)<br><br>ORDER |

LORETTA A. PRESKA, Senior United States District Judge:

    Before the Court is Defendant Reza Olangian's motion for sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), (dkt. no. 189), the Government's opposition, (dkt. no. 191), and Defendant's reply, (dkt. no. 195). For the reasons set forth below, the motion is denied.

**I.   Background**

    **a. Offense Conduct**

    From May through October 2012, Defendant, a dual citizen of the United States and Iran, tried to obtain anti-aircraft missiles for the Iranian government. (See dkt. no. 67 at 42:2-7, 44:7-22.) In May 2012, Defendant met with a confidential source, who was working at the direction of the Drug Enforcement Administration ("DEA") and testified at trial under the pseudonym Max Buchinsky. (Id. at 79:4-80:17; dkt. no. 75 at 404:16.) Defendant first met Buchinsky in Kiev, Ukraine, during a series of recorded meetings on May 2 and 3, 2012. (Dkt. no. 67 at 80:14-82:10, 94:6-95:22.) Buchinsky posed as a Russian weapons broker, who could supply

military-grade weaponry and other items. (Id. at 142:6-144:19; dkt. no. 75 at 417:15-20.) Defendant inquired about obtaining aircraft parts for Russian military aircraft and IGLA-S anti-aircraft missile systems. (Dkt. no. 75 at 440:3-442:16, 446:11-447:10.) Defendant and Buchinsky discussed a potential deal involving aircraft parts and IGLA-S missile systems, including the pricing of such missile systems and the logistics of their delivery to Iran. (Id. at 447:16-449:25.) Defendant conveyed that the parts were intended for the Iranian government and referenced his participation in a prior, unsuccessful attempt to obtain IGLA-S missile systems for the Iranian government. (Id. at 437:10-12, 439:3-9, 451:3-13.)

Following the May 2 and 3, 2012 meetings in Ukraine, Defendant continued to communicate with Buchinsky via email, telephone, and Skype regarding the sale. Defendant discussed the terms of the deal with Buchinsky and further clarified the quantities of materials that Defendant would purchase for transfer to Iran. (Id. at 491:17-492:17, 510:4-23, 520:1-521:15; dkt. no. 77 at 540:7-21.)

After several electronic communications during the summer of 2012, on August 17, 2012, Defendant and Buchinsky engaged in a Skype videoconference to discuss some of the terms of the anticipated transaction. (Dkt. no. 77 at 573:8-12.) During their discussion, Buchinsky showed Defendant an IGLA-S missile system.

2

(Id. at 595:2-9.)  Defendant asked Buchinsky a number of detailed questions about the sample IGLA-S missile system, including whether the missile system had a particular type of night vision detector and how many missiles accompanied each missile system. (Id. at 604:19-605:7, 607:16-609:4.)  At the conclusion of the meeting, Defendant expressed a desire to acquire a minimum of 200 additional IGLA-S missiles if the first delivery of missiles went smoothly.  (Id. at 610:2-11.)

Following the August 2012 videoconference, Defendant and Buchinsky continued to communicate about the anticipated transaction.  (Id. at 624:5-7, 633:11-22, 647:3-15.)  They finalized the prices, quantities, and delivery of the requested items, including the aircraft parts and the IGLA-S missile systems. (Id. at 628:2-21, 642:3-25.)  Defendant indicated that he intended to take all of the materials across the border into Iran and had made arrangements with buyers in Iran.  (Id. at 642:9-11.)

On or about October 10, 2012, Defendant traveled from Iran to Tallinn, Estonia, to meet with Buchinsky to discuss payment and delivery of the IGLA-S missile systems.  (Dkt. no. 67 at 154:2-155:23, 157:7-9.)  Upon his arrival at the Tallinn airport, Estonian police arrested Defendant pursuant to a provisional arrest warrant.  (Id. at 156:16-157:19.)

Following his arrest, Defendant waived his Miranda rights and spoke with DEA agents in Estonia on October 10 and 11, 2012, and

again on October 31 and November 1, 2012. (Id. at 159:22-24, 162:5-163:7, 168:6-11, 190:13-19, 192:10-14.) He made multiple admissions to the DEA, including that approximately five years before his arrest, he attempted to purchase approximately 100 IGLA-S missiles for the Iranian Ministry of Defense. (Id. at 163:16-17, 165:1-25, 169:5-170:22.) Though Defendant traveled internationally and engaged in extensive negotiations about the missile deal, it was ultimately unsuccessful. (Id. at 171:19-173:10.) Defendant also admitted that in late September and early October 2012, he attended multiple meetings in Tehran with individuals who said they were officials from the Iranian Ministry of Defense about the acquisition of aircraft and IGLA-S missiles. (Dkt. no. 79 at 708:5-15, 723:5-12.)

**b. Procedural History**

On October 19, 2012, a grand jury sitting in this District returned a four-count indictment. (See dkt. no. 6.) Count One charged Defendant with conspiring to acquire and transfer anti-aircraft missiles, in violation of 18 U.S.C. §§ 2332g(a)(1), (b)(2), (c)(1), and 3238. Count Two charged Defendant with attempting to acquire and transfer anti-aircraft missiles, in violation of 18 U.S.C. §§ 2332g(a)(1), (b)(2), (c)(1), 3238, and 2. Count Three charged Defendant with conspiring to violate IEEPA, in violation of 50 U.S.C. § 1705 and 18 U.S.C. § 3238. Finally,

Count Four charged Defendant with attempting to violate IEEPA, in violation of 50 U.S.C. § 1705 and 18 U.S.C. §§ 3238 and 2.

Defendant proceeded to trial, and, on November 22, 2016, the jury returned its verdict, convicting him on all counts. (See dkt. no. 99.) On April 24, 2018, the Court sentenced Defendant to a below-Guidelines sentence of 25 years' imprisonment—the mandatory minimum—on Counts One and Two, to run concurrently with a sentence of 20 years' imprisonment on Counts Three and Four, to be followed by five years of supervised release. (See Sent. Tr., dated Apr. 24, 2018 [dkt. no. 144] at 22:23-23:25.) In imposing this sentence, the Court explained that "certainly a lengthy sentence of incarceration" was warranted to reflect the seriousness of Defendant's "very serious" offense and to promote general deterrence, as well as specific deterrence, given Defendant's multiple "attempts to enter into the conduct that was the basis of [his] conviction." (Id. at 22:23-23:14.) The Court also took into account Defendant's age and the fact he was criminal history category I. (Id. at 23:2-4.)

Following the imposition of the judgment, Defendant appealed his conviction. (See dkt. no. 142.) The Court of Appeals affirmed the conviction on or about May 5, 2020. See United States v. Olangian, 803 F. App'x 536, 538 (2d Cir. 2020) (summary order). Defendant then filed a petition for certiorari. The Supreme Court

denied that petition on October 5, 2020.  See Olangian v. United States, 141 S. Ct. 384 (2020).

### c. Current Custody Status

Defendant is currently housed at Terminal Island FCI.  His projected release date is March 10, 2034.

### d. Instant Motion

On or about October 29, 2023, Defendant filed his motion for compassionate release.  (See dkt. no. 189.)  Defendant argues that a reduction in his sentence is warranted because of (i) his health conditions, (ii) the conditions of his imprisonment, and (iii) the need to care for his adult son.  In addition, Defendant argues that the Section 3553(a) factors support his early release.

## II. Applicable Law

Under 18 U.S.C. § 3582, as amended by the First Step Act, the court "may not modify a term of imprisonment once it has been imposed," except that:

> [T]he court, upon motion of the Director of the Bureau of Prisons [(the "BOP")], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and

that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A)(i).

"Originally, § 3582(c)(1)(A) did not permit defendants to initiate compassionate release proceedings; it required the BOP to seek such release on their behalf." United States v. Corbett, No. 10 Cr. 184 (PAE), 2023 WL 8073638, at *3 (S.D.N.Y. Nov. 21, 2023). But in 2018, Congress enacted the First Step Act and "authorized courts to reduce a term of imprisonment upon motion by a defendant." United States v. Amato, 48 F.4th 61, 63 (2d Cir. 2022) (per curiam).

The Sentencing Commission is responsible for "describ[ing] what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). Accordingly, even before the First Step Act was enacted, the Sentencing Commission promulgated a policy statement—Section 1B1.13 of the Guidelines—concerning sentence reductions under Section 3582, which explained, among other things, what constitutes an extraordinary and compelling reason for a sentence reduction. See U.S.S.G. 1B1.13(b).

In September 2020, the Court of Appeals held that this policy statement "applied only to a 'motion of the Director of the Bureau of Prisons[]' . . . and not 'to compassionate release motions

brought by defendants[.]'" Corbett, 2023 WL 8073638, at *3 (quoting United States v. Brooker, 976 F.3d 228, 236 (2d Cir. 2020)). As a result, the Court of Appeals explained that the policy statement did not "constrain district courts' discretion to consider whether any reasons are extraordinary and compelling." Brooker, 976 F.3d at 236. Even though Section 1B1.13 did not govern compassionate release motions filed by a defendant, district courts were nevertheless able to "look[ ] to § 1B1.13 for guidance in the exercise of [their] discretion" when considering such a motion. United States v. Rodriguez, No. 16 Cr. 07 (AJN), 2020 WL 7640539, at *3 (S.D.N.Y. Dec. 23, 2020).

However, "[e]ffective November 1, 2023, . . . the Sentencing Commission amended the Guidelines to also cover defendant-initiated petitions." Corbett, 2023 WL 8073638, at *3 (citing Amendments to the Sentencing Guidelines, 88 Fed. Reg. 28254-01 (May 3, 2023) (effective Nov. 1, 2023)). "The amended guidance from the Commission as to what constitutes extraordinary and compelling reasons now controls the analysis of a compassionate release petition, however initiated." Id. Section 1B1.13 of the Guidelines, as amended, explains what circumstances, "singly or in combination," constitute extraordinary and compelling reasons for release. Id. These include, at a high level, certain medical circumstances of the defendant, the age of the defendant, certain family circumstances, whether the defendant was the victim of abuse

8

while in custody, other circumstances of similar gravity, and changes in law that make the defendant's sentence unusually long. See U.S.S.G. § 1B1.13(b).

In short, when a court considers a motion for compassionate release filed by a defendant, the court may only grant that motion where the defendant has demonstrated that (i) he has exhausted his administrative remedies, (ii) there are extraordinary and compelling reasons for a reduction of the sentence, (iii) the Section 3553(a) factors favor such a reduction, and (iv) such a reduction is consistent with the Sentencing Commission's policy statements.  See 18 U.S.C. § 3582(c)(1)(A)(i).  The defendant, as the proponent of the motion, bears the burden of proving that he is entitled to the requested relief under Section 3582. See United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue."); United States v. Givens, No. 14 Cr. 546-09 (CM), 2020 WL 4699042, at *2 (S.D.N.Y. Aug. 13, 2020) (similar).

**III. Discussion**

The Government argues that Defendant did not include his conditions of confinement and his desire to care for his adult son when he requested compassionate release from the Warden at FCI Terminal Island.  (See dkt. no. 191 at 6-7.)  Assuming without deciding that those conditions are "reasonably related" to the

9

exhausted grounds, see United States v. Gluzman, No. 7:96-CR-323 (LJL), 2020 WL 4233049, at *12 (S.D.N.Y. July 23, 2020), the Court will consider Defendant to have exhausted his administrative remedies.

Nevertheless, including all of Defendant's arguments, he has not established extraordinary and compelling circumstances warranting release.  He bases his arguments on (1) his medical conditions, (2) the harsh conditions of his confinement, and (3) his desire to care for his adult son.

First, Defendant states that he has a variety of health conditions, including chronic ulcerative colitis, an enlarged prostate and urinary issues, back pain, Hepatitis B, hemorrhoids, loss of vision, and gastroesophageal reflex disease, which cause him pain and lead to "daily indignities related to his bowel and urinary conditions."  (Dkt. no. 189 at 7.)  Although the Court is sympathetic to Defendant's conditions, they do not constitute extraordinary and compelling circumstances warranting release under Section 1B1.13.  That section prescribes medical conditions which can be extraordinary and compelling where the defendant (i) is "suffering from a terminal illness"; (ii) is suffering from serious medical conditions "that substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover"; (iii) is "suffering from a medical

10

condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death"; or (iv) the defendant is at risk for severe medical complications or death as a result of exposure to an ongoing outbreak of infectious disease or public health emergency.  See U.S.S.G. § 1B1.13(b)(1).  Even if that section were not applicable in light of the November 1, 2023 amendments to the Guidelines, (dkt. no. 189 at 1, n.1), the Court may still "look to that provision for guidance." United States v. Hatcher, No. 18-CR-454-10 (KPF), 2021 WL 1535310, at *3 (S.D.N.Y. Apr. 19, 2021).

Defendant does not argue that he is suffering from terminal illness or that he is at higher risk of contracting COVID-19 because of his conditions.  Instead he argues that his conditions are sufficiently serious to warrant early release.  But "[t]he BOP has elaborated on what qualifies as a serious physical or medical condition:  It is when the defendant either has an 'incurable progressive illness or has suffered a debilitating injury from which he will not recover'; is 'completely disabled, meaning the defendant cannot carry on any self-care and is being totally confined to a bed or chair'; or is 'capable of only limited self-care and confined to a bed or chair more than 50% of waking hours.'" United States v. Lisi, 440 F. Supp. 3d 246, 251 (S.D.N.Y. 2020) (citation omitted).  Defendant's medical records do not

11

indicate that any of his conditions rise to this level. (See dkt. no. 191, Ex. A ("Medical Records") (filed under seal).) Indeed, as recently as September 26, 2023 – approximately a month before Defendant filed this motion – he told his doctors that he did not have "functional limitations and report[ed] independence with [activities of daily living]." (Id. at 17.) In addition, the BOP has provided Defendant with care for his ailments by, among other things, scheduling surgery, providing medication, providing physical therapy, and sending him to non-BOP facilities to receive care when appropriate. While he complains that the "BOP does not offer a meaningful array of the types of food his body requires," (dkt. no. 189 at 8), he has not alleged that he does not have food, and his medical records appear to reflect that he is on a "therapeutic diet." (See Medical Records at 20-21, 134.) Indeed, the BOP seems to have taken steps to improve Defendant's daily quality of life, including by providing extra rolls of toilet paper, personal soft shoes, a double mattress, and a longer time to chew and digest food. (Id. at 134.) Thus, Defendant has not established extraordinary and compelling circumstances warranting release on the basis of his physical condition.

Second, Defendant argues that his time spent at Metropolitan Correction Center in New York, ("MCC"), and at federal prisons in California during the COVID-19 pandemic constitute independent reason for early release. (See dkt. no. 189 at 10-12.) While

12

Defendant may have experienced some difficulties in prison, "everyone incarcerated at these facilities experienced the same conditions." United States v. Crumble, No. 18 Cr. 32(1) (ARR), 2021 WL 236003, at *4 (E.D.N.Y. Jan. 25, 2021), and even if Defendant faced particularly difficult conditions during the pandemic, he does not claim that he is currently suffering from such conditions. Thus, current conditions at Terminal Island FCI do not constitute an extraordinary and compelling reason for Defendant's early release. See United States v. Davis, No. 12 Cr. 712 (SHS), 2022 WL 1182756, at *1 (S.D.N.Y. Apr. 6, 2022) (finding, after cases at FCI Danbury had declined to zero following the Omicron spike, that the conditions at FCI Danbury did not constitute extraordinary and compelling reasons for release).

Finally, Defendant argues that he should be released early to care for his adult son who suffers from severe depression. (See dkt. no. 189 at 12-14.) Defendant's son lives with his mother and brother, who care for him in Iran, and Defendant states that the mother wants to move out of the apartment she shares with the son, and the brother has to get a job because of financial conditions in Iran. (Id. at 13-14.) In addition, Defendant argues that his son will receive better benefits if he lives in the United States and Defendant is his only caregiver. (Id. at 14.) These circumstances, although unfortunate, are not extraordinary and compelling.

Section 1B1.13 explains that family circumstances can rise to the level of extraordinary and compelling where the defendant's adult child is incapable of self-care because of a mental or physical disability or medical condition and that child's caregiver has died or become incapacitated. U.S.S.G. § 1B1.13(b)(3)(A). That is not the situation here. Although Defendant may be the only caregiver in the United States, his son has care in Iran. Defendant has not alleged that the caregivers have become incapacitated or died, such that the defendant is the "only available caregiver." Lisi, 440 F. Supp. 3d at 252. Thus, even taking together all of the facts alleged by Defendant, he has not established extraordinary and compelling circumstances warranting release. Even if he had, the Section 3353(a) factors counsel against early release. As the Court acknowledged at sentencing, Defendant's offense was "very serious," and a lengthy sentence was warranted to account for the nature of the offense, to protect the public, and to afford deterrence. (See Sent. Tr. 22:23-23:1.)

Defendant attempted to obtain hundreds of anti-aircraft missiles for the Iranian government. (See dkt. no. 67 42:2-17, 44:7-22.) Thankfully, he attempted to obtain these missiles from a DEA confidential source. A sentence of 25 years—the mandatory minimum—is appropriate to address that conduct and to protect the public.

14

Aside from providing just punishment for such a serious offense, a significant sentence is necessary for both specific and general deterrence.  Of course general deterrence is important in addressing conduct such as Defendant's that can be a danger to the United States and its allies, but specific deterrence is important in this case too.  Although the Defendant has minimal criminal history, this was not the first time he tried to purchase dangerous weapons for the Iranian government; by his own admission, he attempted to purchase 100 missiles for the Iranian Ministry of Defense five years before.  (See dkt. no. 67 at 163:16-17, 165:5-25.)

Defendant also argues that his age and "excellent disciplinary record" merit release.  (See dkt. no. 189 at 15.) But the Court considered his age when imposing a below-Guidelines sentence, (Sent. Tr. at 23:2-4), and rehabilitation alone, while commendable, cannot justify early release in this case where Defendant has served less than half of his sentence. Accordingly, even if Defendant had established extraordinary and compelling circumstances warranting release, the 3553(a) factors counsel against release.

## IV. Conclusion

For the reasons set forth above, Defendant Reza Olangian's motion for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), (dkt. no. 189), is denied.

**SO ORDERED.**

Dated:   New York, New York
         October 2, 2024

_____
LORETTA A. PRESKA
Senior United States District Judge