UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────
  REZA OLANGIAN,

                    Petitioner,            21 Civ. 08166 (LAP)
                                            12 Cr. 00798(LAP)
  -against-
                                           MEMORANDUM & ORDER
  UNITED STATES OF AMERICA,

                    Respondent.
└─────────────────────────────────────
```

LORETTA A. PRESKA, Senior United States District Judge:

Before the Court is Petitioner Reza Olangian's motion,[1] pursuant to 28 U.S.C. § 2255, to vacate, set aside, or correct his sentence.[2]  Mr. Olangian argues that he "is entitled to a new trial" or "[a]t the very least . . . entitled to an evidentiary hearing on the ineffective assistance of counsel claim."  (See Supp. Mot. at 2.)  The Government opposes the motion.[3]  For the reasons set forth below, Mr. Olangian's § 2255 motion is DENIED.

---

[1] Unless otherwise stated, all citations refer to 12 Cr. 00798.

[2] (See First Motion to Vacate under 28 U.S.C. § 2255 ("Mot. Vacate"), dated Oct. 3, 2021 [dkt. no. 167]; Olangian Decl., dated Oct. 17, 2022 [dkt. no. 181]; Memorandum of Law in Support by Reza Olangian's Supplement to 2225 Motion ("Supp. Mot."), dated Oct. 17, 2022 [dkt. no. 182]; Reply, dated July 17, 2023 [dkt. no. 188].)

[3] (See Memorandum of Law of the United States of America in Opposition to Petitioner's Motion to Vacate, Set Aside, or Correct His Sentence ("Gov't Opp'n"), dated June 15, 2023 [dkt. no. 185].)

## I.  Background

### a.  The Indictment

On October 19, 2012, a grand jury charged Mr. Olangian in a four-count indictment.  (See Sealed Indictment ("Indictment"), dated Oct. 19, 2012 [dkt. no. 6].)  Mr. Olangian was charged with violating 18 U.S.C. §§ 2232(g), 3238, and 2; 50 U.S.C. § 1705; and 31 C.F.R. §§ 560.203 and 560.204.  (See id. at 9.)

Count One of the Indictment charged Mr. Olangian with conspiring to acquire and transfer anti-aircraft missiles, in violation of 18 U.S.C. §§ 2232g(a)(1), (b)(2), (c)(1), and 3238. (See id. at 1-3.)  Count Two of the Indictment charged Mr. Olangian with attempting to acquire and transfer anti-aircraft missiles in violation of 18 U.S.C. §§ 2232g(a)(1), (b)(2), (c)(1), 3238, and 2.  (See id. at 3-4.)  Count Three of the Indictment charged Mr. Olangian with conspiring to violate the International Emergency Economic Powers Act (IEEPA) in violation of 50 U.S.C. § 1705 and 18 U.S.C. § 3238.  (See id. at 4-6.)  Count Four of the Indictment charged Mr. Olangian with attempting to violate the IEEPA in violation of 50 U.S.C. § 1705 and 18 U.S.C. §§ 3238 and 2.  (See id. at 6-7.)

The Indictment described overt acts that began on or about May 2, 2012, when Mr. Olangian traveled to Kiev, Ukraine and discussed aircraft parts he wanted to acquire with a Drug Enforcement Administration ("DEA") confidential source ("CS"), Max

2

Buchinsky.  (See id. at 2, 5-6.)  Mr. Olangian subsequently (1) video-conferenced with the CS and inspected an anti-aircraft missile and discussed the purchase of anti-aircraft missile systems, (2) sent an urgent email to the CS emphasizing the need to sign and consummate the transaction, (3) discussed with the CS via telephone the prices and methods of payment for the missiles, and (4) sent an email to the CS requesting a photograph of the missile he had seen via video-conference.  (See id. at 2-3, 5-6.)

### b.  Trial and Sentencing

Mr. Olangian's trial began on November 7, 2016.  (See Trial Transcript ("Tr.") at 1.)[4]  The trial lasted over two weeks, concluding when the jury reached its verdict on November 22, 2016. (Id. at 1471.)  Mr. Olangian was represented by Mr. Lee Ginsberg, who was assisted by Ms. Nadjia Limani, as court-appointed Criminal Justice Act ("CJA") counsel.  (Id. at 1.)

### 1.  The Government's Case

At trial, the Government argued that Mr. Olangian intended to illegally purchase the anti-aircraft missiles in order to make

---

[4] The trial transcript spans across several documents on the criminal docket (12 Cr. 00798): trial transcript pages 1-37 [dkt. no. 63]; trial transcript pages 38-242 [dkt. no. 67]; trial transcript pages 243-379 [dkt. no. 71]; trial transcript pages 380-531 [dkt. no. 75]; trial transcript pages 532-666 [dkt. no. 77]; trial transcript pages 667-847 [dkt. no. 79]; trial transcript pages 848-1045 [dkt. no. 85]; trial transcript pages 1046-1241 [dkt. no. 89]; trial transcript pages 1242-1389 [dkt. no. 93]; trial transcript pages 1390-1474 [dkt. no. 95.]

money.   (Id. at 9, 1245, 1263.)   DEA Agent Jeffrey Higgins testified that Mr. Olangian said he was motivated by financial gain.  (Id. at 177, 199.)  The Government introduced a plethora of evidence illustrating the steps Mr. Olangian took in his attempt to purchase anti-aircraft missiles for Iran.

On May 2-3, 2012 in Kiev, Ukraine, Mr. Olangian first met with the CS in a series of recorded meetings.  (Id. at 80-82, 94-95.)  The CS posed as a weapons dealer at the direction of the DEA.  (Id. at 417.)  Following the meetings in Kiev, the DEA instructed the CS to continue negotiating the sale of military weapons and parts with Mr. Olangian.  (Id. at 142.)  Within the week they began communicating via email.  (Id. at 491-92.)  Mr. Buchinsky testified about their subsequent communications, including a telephone call on May 23, 2012, (id. at 510), a telephone call on June 7, 2012, (id. at 519-20), emails on or about June 19, 2012, (id. at 538), a Skype video-conference on August 17, 2012, (id. at 573), a telephone call on August 19, 2012, (id. at 624), an email from Mr. Olangian on August 31, 2012, (id. at 634), and an email from Mr. Olangian on September 1, 2012, (id. at 647).

In those subsequent discussions Mr. Olangian discussed the possibility of purchasing military aircraft parts and anti-aircraft missiles.  (Id. at 440-47.)  Mr. Olangian explained that the equipment was for the Iranian government and that he had

4

previously tried to purchase anti-aircraft missiles for Iran.  (Id. at 437-39, 451.)  Mr. Olangian communicated his intention to buy engine parts for fighter-jets and requested that they meet in Afghanistan for Mr. Olangian to inspect the parts prior to purchase.  (Id. at 443, 447-49.)  Mr. Olangian also visually inspected an anti-aircraft missile over a Skype video-conference, asked multiple questions regarding its capabilities, and at the end of the meeting expressed an intention to purchase a minimum of 200 anti-aircraft missiles.  (Id. at 573, 595, 604-10.)

Following the August 17, 2012, Skype video-conference call, Mr. Olangian and the CS continued to negotiate the anticipated transaction.  (Id. at 623-64.)  Eventually they finalized the price of a down payment, and Mr. Olangian laid out his requested procedures for inspecting, paying, and delivering the aircraft parts and anti-aircraft missiles.  (Id. at 628-29, 642.)  Mr. Olangian indicated that he had people ready to receive the delivery at the Afghanistan border.  (Id. at 642.)  Eventually, on October 10, 2012, Mr. Olangian traveled from Iran to Tallinn, Estonia to meet with the CS and discuss the payment and delivery of the anti-aircraft missiles.  (Id. at 154-55.)  Mr. Olangian was arrested by the Estonian police upon his arrival at the Tallinn airport.  (Id. at 156-157.)

Following his arrest, Mr. Olangian waived his Miranda rights and spoke with DEA agents in Estonia on October 10-11, 2012, and

5

then again on October 31, 2012, and November 1, 2012.  (Id. at 159, 168, 190, 192.)  Throughout these meetings Mr. Olangian mentioned that he was motivated by financial gain, (id. at 199), that five years prior he had unsuccessfully attempted to purchase anti-aircraft missiles for the Iranian Ministry of Defense, (id. at 163, 165, 171-73), and that he attended multiple meetings with individuals he believed were Iranian defense officials about acquiring aircrafts and anti-aircraft missiles for Iran.  (Id. at 80, 708, 723.)

### 2.  Mr. Olangian's Defense

Defense counsel did not dispute that Mr. Olangian engaged in multiple discussions with people regarding purchasing weapons. (Id. at 1336.)  However, defense counsel disagreed with the Government's characterization of Mr. Olangian's motive behind these meetings and discussions.  (Id. at 1336.)  Defense counsel argued that instead of being motivated by money, Mr. Olangian was motivated by political activism and never had any intention to consummate these weapons deals.  (Id. at 31-32.)

In the opening statement, Mr. Ginsberg stated that Mr. Olangian planned to "get the Iranian government on the hook" for an anti-aircraft missile contract and then expose its efforts to procure materials in violation of international sanctions.  (Id. at 31-34.)  In closing, Mr. Ginsberg continually focused on the theory that no deal ever actually occurred because Mr. Olangian

never intended to close any deals, not because he was arrested before completing them. (Id. at 1336, 1342, 1351, 1358-59.)

Mr. Olangian advanced this same theory in his testimony. First, he testified that he and multiple family members had been involved in opposition activities against the Iranian government for many years, which sometimes resulted in serious physical injuries from government agents. (Id. at 872-77, 896-98, 946-58.) Second, he testified that his opposition to the Iranian government was the driving force behind his pursuit of anti-aircraft weapons for Iran. (Id. at 931-32, 935.) Mr. Olangian testified that he planned to secure a weapons contract to show Iran's attempt to buy anti-aircraft missiles, then notify his journalist connections so that they could reveal that the Iranians were grossly violating international laws, which would result in Iran "facing a drastic sanction," which then "would bring some logic to their work, and they would stop enriching uranium." (Id. at 931-32, 935)

### 3. Sentencing

On November 22, 2016, the jury returned a guilty verdict on all counts. (Id. at 1471.) Sentencing was originally set for March 13, 2017. (Id. at 1473.)

Following trial, Mr. Olangian began to find his legal representation unsatisfactory. On January 24, 2017, Mr. Ginsberg requested that the Court permit him to withdraw from representing Mr. Olangian because their relationship "bec[a]me untenable."

7

(See dkt. no. 101.)  On February 2, 2017, the Court granted this request and appointed Mr. Gregory Morvillo as counsel.  (See dkt. no. 102.)  On July 26, 2017, Mr. Olangian requested that Mr. Morvillo be replaced as well.  (See dkt. no. 115.)  On August 17, 2017, the Court appointed another CJA counsel, Mr. Kafahni Nkrumah, "for the limited purpose of giving Mr. Olangian a second opinion."  (See dkt. no. 116.)  On December 7, 2017, Mr. Nkrumah told the Court that he had "come to the same conclusion that Mr. Morvillo came to with Mr. Olangian regarding his motions and the alleged errors in the case . . . that there aren't any."  (See dkt. no. 128 at 2.)

On March 14, 2018, after multiple sentencing adjournments, Mr. Olangian was sentenced to a term of 25 years of imprisonment. (See Judgment, dated Mar. 14, 2018 [dkt. no. 140] at 3.)  Due to finding that "much of Mr. Olangian's testimony was diametrically opposed to other evidence received," the Court found an obstruction of justice enhancement appropriate.  (See Sentencing Transcript ("Sent. Tr."), dated Mar. 14, 2018 [dkt. no. 144] at 5-6.)

### c.  Post-Sentencing Proceedings

On April 18, 2018, Mr. Olangian appealed his conviction.  (See dkt. no. 142.)  Mr. Olangian challenged his conviction on five grounds:

> (1) that there was prosecutorial misconduct during trial that warrants reversal because the government improperly elicited from its

law enforcement witnesses their belief that
Olangian was untruthful during six post-arrest
interviews; (2) that Olangian was improperly
asked during his cross-examination whether law
enforcement agents made up part of their
testimony; (3) that it was reversible error
for the district court to have given an
uncalled-witness charge in its jury
instructions; (4) that his Sixth Amendment
right to counsel was violated when the court
did not permit him to briefly consult with
counsel during his redirect examination; and
(5) that it was reversible error for the court
to have denied his motion for a mistrial after
testimony was elicited about a purported
previous arms deal not charged in the
indictment.

See United States v. Olangian, 803 F. App'x 536, 537 (2d Cir.

2020); (See Mandate of USCA ("USCA Mandate"), filed July 20, 2020

[dkt. no. 161].). The Court of Appeals found these claims to be

without merit and affirmed his conviction.  See Olangian, 803 F.

App'x at 538.  Mr. Olangian was represented by Jonathan I.

Edelstein for the appeal.  See id. at 536.

### d. The Instant Motion

On October 3, 2021, Mr. Olangian filed a 28 U.S.C. § 2255

motion requesting his sentence be vacated, set aside, or corrected.

(See Mot. Vacate.)  On October 17, 2021, Mr. Olangian filed a

supplemental motion to his original motion.  (See Supp. Mot.)  The

supplemental motion is timely.  (See dkt. nos. 172, 176, 178, and

180.)

In his supplemental motion, Mr. Olangian abandoned all

previous "legal arguments . . . that are not addressed in this

supplement." (See Supp. Mot. at 1.) The supplemental motion focused on Mr. Olangian's "claim of ineffective assistance of counsel concerning his trial counsel." (See Supp. Mot. at 1.)

Mr. Olangian alleges multiple instances in which Mr. Ginsberg performed deficiently at trial: (1) he failed to prepare sufficiently for trial; (2) he failed to seek a brief continuance of the trial in view of Mr. Olangian's severe colitis and adverse reaction to a prednisone prescription; (3) he failed to offer readily-available and credible evidence that (a) Mr. Olangian never intended to consummate any of the purported deals and (b) that Mr. Olangian deeply hated the Iranian Regime; (4) he failed to point out in closing arguments that there was no proof of Mr. Olangian's supposed $15 million bank account in Turkey; (5) he failed to move in limine to prevent the DEA agents from testifying about Mr. Olangian's alleged dealings in 2008 with weapons-for-drug traders in Tajikistan; and, (6) he failed to object during the Government's summation when it stated that Mr. Olangian lied in his trial testimony. (See Supp. Mot. at 9-27.) Mr. Olangian argues that these alleged deficiencies are "clearly prejudice[ial]" to him "when considered cumulatively." (Id. at 28.)

Mr. Olangian believes that these alleged deficiencies and their alleged prejudicial effects entitle him to a new trial. (Id. at 2.) If not a new trial, he believes that "[a]t the very least,

10

he is entitled to an evidentiary hearing on the ineffective assistance of counsel claim." (Id.)

On June 15, 2023, the Government responded that Mr. Olangian fell "far short of demonstrating that his trial counsel acted in an objectively deficient manner or caused him any prejudice." (See Gov't Opp'n at 2.) Regarding the allegation that trial counsel was insufficiently prepared, the Government argues that Mr. Olangian's "defense team far surpassed any ineffectiveness bar." (See id.) Regarding the other alleged instances of ineffective counsel, the Government argues that they were "strategic decisions" by Mr. Olangian's trial counsel that "do not form the basis of a valid ineffectiveness claim." (See id.) The Government believes Mr. Olangian's "Section 2255 petition should be denied without a hearing." (Id.)

On July 17, 2023, Mr. Olangian replied to the Government's response. (See Reply.) In the Reply, Mr. Olangian stressed that "the [G]overnment errs by addressing the individual acts of deficient performance alleged by the defendant in isolation rather than considering whether trial counsel's overall performance was deficient." (Id. at 2.) Mr. Olangian argues that "the proper inquiry is whether trial counsel performed deficiently when all of counsel's challenged acts or omissions are considered together." (See id.) In essence, Mr. Olangian alleges that the "multiple acts of deficient performance by his trial counsel . . . when

considered holistically and in a light most favorable to the defendant, demonstrate a reasonable probability that, but for such deficient performance, at least one member of the jury would have voted to acquit him." (See id. at 14.)

## II. Legal Standards

### a. Ineffective Assistance of Counsel

Under 28 U.S.C. § 2255, a federal prisoner "may move the court which imposed the sentence to vacate, set aside, or correct the sentence" on the grounds, inter alia, that the "sentence was imposed in violation of the Constitution." 28 U.S.C. § 2255(a). Relief under § 2255 is available "for a constitutional error . . . or an error of law or fact that constitutes a 'fundamental defect which inherently results in a complete miscarriage of justice.'" See United States v. Bokun, 73 F.3d 8, 12 (2d Cir. 1995) (citations omitted).

The Sixth Amendment's guarantee of counsel includes the right to effective assistance of counsel.[5] See McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970) (stating "[i]t has long been recognized that the right to counsel is the right to the effective assistance of counsel"). When evaluating an ineffective assistance of counsel claim, "the ultimate focus of inquiry must

---

[5] See U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense").

be on the fundamental fairness of the proceeding whose result is being challenged." See Strickland v. Washington, 466 U.S. 668, 696 (1984). The result is entitled to a "strong presumption of reliability," but results are considered unreliable when there is "a breakdown in the adversarial process that our system counts on to produce just results." See id. "Since fundamental fairness is the central concern of the writ of habeas corpus, no special standards ought to apply to ineffectiveness claims made in habeas proceedings." Id. at 697-98 (internal citations omitted).

In Strickland, the Supreme Court set forth the two-pronged standard for evaluating an ineffective assistance of counsel claim: "First, the defendant must show that counsel's performance was deficient" and "[s]econd, the defendant must show that the deficient performance prejudiced the defense." See id. at 687. The defendant bears the burden of proving both prongs by a preponderance of the evidence. See Waiters v. Lee, 857 F.3d 466, 477 n.19 (2d Cir. 2017).

### 1.   Prong One – Deficient Performance

A defendant succeeds on the first prong when he or she proves that counsel's performance was "below an objective standard of reasonableness" when measured "under prevailing professional norms." See Strickland, 466 U.S. at 688. In assessing the first prong, the Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional

13

assistance." See id. at 689. As "[e]ven the best criminal defense attorneys would not defend a particular client in the same way," attorney decisions are presumed reasonable to avoid the pitfalls of hindsight bias. See id. Courts must "accord proper weight to the role of defense counsel in fashioning an overall trial strategy." See United States v. Plitman, 194 F.3d 59, 64 (2d Cir. 1999). Strategic choices made by counsel, after a reasonable investigation into the laws and facts, "are virtually unchallengeable." See Strickland, 466 U.S. at 690. Decisions not to investigate completely are also deemed reasonable when professional judgment supports that decision. See id. at 690-91. Furthermore, tactical trial decisions such as whether to offer evidence, stipulate evidence, when to object, and on what grounds to object are "virtually unchallengeable absent exceptional grounds." See United States v. Cohen, 427 F.3d 164, 170 (2d Cir. 2005) (citations omitted).

### 2. Prong Two – Prejudice

A defendant succeeds on the second prong when he or she "show[s] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." See Strickland, 466 U.S. at 694. In assessing the second prong, the Court assesses prejudice by asking whether "absent the errors, the factfinder would have had a reasonable doubt" as to the defendant's guilt. See id. at 695.

The Court must consider the totality of the evidence, as some errors will "alter[] the entire evidentiary picture, and some will have had an isolated, trivial effect."  See id. at 695-96.  The Court may consider the prejudice prong first and dispose of a case on prejudice grounds without ever reaching the question of deficient performance.  See id. at 697 ("[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed").

## III. **Discussion**

Mr. Olangian alleges multiple instances of ineffectiveness and claims that when analyzed cumulatively they show that his counsel's actions and inactions were deficient and prejudicial. After conducting a holistic analysis, the Court finds that Mr. Olangian's counsel was not ineffective.

Mr. Olangian's trial counsel did not act in an objectively deficient manner.  Additionally, there is not a reasonable probability that the jury would have reached a different outcome had trial counsel prepared more, sought a continuance, introduced more evidence, added an additional argument during closing, filed a motion in limine, and objected during the Government's closing. The evidence against Mr. Olangian was overwhelming.  Alternative tactical decisions would have had a trivial impact.

Accordingly, Mr. Olangian's § 2255 motion is denied without a hearing.

###### a.  Counsel's Trial Preparation Was Not Ineffective

Mr. Olangian claims that Mr. Ginsberg did not prepare him effectively for trial.  He cites various examples, including (1) that Mr. Ginsberg did not meet with Mr. Olangian enough and often delegated meetings to Ms. Limani, (2) that neither Mr. Ginsberg nor Ms. Limiani conducted a "role-play" of his potential cross-examination, and (3) that Mr. Ginsberg did not ask certain questions that Mr. Olangian wished Mr. Ginsberg had asked.  (See Supp. Mot. at 9; Reply at 4-5.)  The Court finds that counsel's actions in all instances were not unreasonable under the Strickland standard.

First, there was nothing unreasonable about Mr. Ginsberg's decision to delegate work to Ms. Limani.  Senior lawyers frequently delegate legal work to junior lawyers.  This kind of delegation is both reasonable and encouraged.  Ms. Limani devoted substantial time, almost 530 hours, preparing for Mr. Olangian's trial.  (See dkt. no. 54.)

As Strickland indicates, there are no "mechanical rules" for determining when counsel is effective.  See 466 U.S. at 696.  There is no minimum number of meetings necessary to declare counsel's use effective.  See United States ex rel. Kleba v. McGinnis, 796 F.2d 947, 954 (7th Cir. 1986).  In fact, courts have denied ineffective assistance claims when attorneys met quite infrequently with their client.  See, e.g., United States ex rel.

16

Testamark v. Vincent, 496 F.2d 641, 642-43 (2d. Cir. 1974) (denying ineffective assistance of counsel claim where attorneys only interviewed the client twice before trial); Byas v. Keane, No. 97 Civ. 2789 (SAS), 1999 WL 608787, at *5 (S.D.N.Y. Aug. 12, 1999) (denying ineffective assistance of counsel claim where attorney only met with the client a couple of times for about five to ten minutes each time). In comparison, Mr. Ginsberg met with Mr. Olangian multiple times before trial, with Ms. Limani meeting with Mr. Olangian many more times. (See Olangian Decl. Ex. 1 at ¶ 2). The frequency of their meetings with Mr. Olangian was more than reasonable.

Second, Mr. Olangian does not show how not conducting a role-play overcomes the strong presumption that his trial team was effectively prepared. See Strickland, 466 U.S. at 689 ("A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."). In light of this presumption and counsel team's extensive preparation, not conducting a role-play cannot be considered unreasonable. Furthermore, establishing a requirement that a criminal defendant receive a cross-examination role-play would be the kind of mechanical rule Strickland warned against. Id. at 696.

Third, Mr. Ginsberg's performance throughout Mr. Olangian's direct and redirect examination was reasonable. (See generally

Tr. 871-1009, 1205-38). Mr. Olangian found fault in Mr. Ginsberg's decision not to question him about why DEA Agents Higgins and Odney's trial testimonies "were incorrect . . . that (1) the defendant had 'confessed' during his first meeting with agents to having a profit motive and had not initially told them he was a political activist" and "(2) the defendant did not claim to be a political activist . . . until a subsequent meeting with the agents at the end of October 2012." (See Reply at 4-5.) Although, Mr. Ginsberg did not ask those specific questions, he did ask Mr. Olangian open ended questions about both meetings that provided sufficient room for Mr. Olangian to refute the agents' testimony. (See Tr. at 1002-05.)

### b. Counsel's Decision Not to Seek a Brief Continuance of the Trial Was Not Ineffective

Mr. Olangian's believes counsel's decision not to seek a brief continuance, on the first day of the trial, constitutes ineffective assistance. (See Supp. Mot. at 9-12.) Mr. Olangian claims he sought a continuance because he was feeling adverse effects from being accidently prescribed too much prednisone. (See Olangian Decl. Ex. 1 at ¶¶ 4-7.) Mr. Olangian asserted that "[b]ecause the severe side effects of the prednisone were affecting my ability to focus and to think clearly, on November 7, 2016, I asked Ginsberg to try to briefly postpone the trial . . . [h]e refused to do so." (See id. at ¶ 7.) Mr. Olangian claims not

seeking a continuance was prejudicial because the prednisone caused him to appear out of control on the witness stand. (<u>See</u> <u>id.</u> at ¶ 8.)

Mr. Olangian claims that there was no strategic reason for not seeking a continuance. (<u>See</u> Supp. Mot. at 12.) However, when considering the relevant factors in Mr. Olangian's case: that the continuance request would have come on the first day of the trial after jury selection was or was about to be underway, in a case that had been pending for four years, where the Court had already granted multiple adjournments that postponed the trial from its original scheduled start date of June 15, 2015 – it is difficult to declare Mr. Ginsberg's decision unreasonable under prevailing professional norms. (<u>See</u> dkt. no. 31 at 7; dkt. nos. 36, 42, 49.) In comparison, ineffective assistance claims have been denied where counsel declined to seek a continuance for a case that was pending for two years. <u>See, e.g.</u>, <u>Donato v. United States</u>, No. 09 Civ. 5617 (NGG), 2012 WL 4328368, at *7 (E.D.N.Y. Sept. 20, 2012).

It is likely that Mr. Ginsberg thought the Court would deny the last-minute health-related request and concluded it was not worth requesting. <u>See, e.g.</u>, <u>United States v. Barbarino</u>, 612 F. App'x 624, 626 (2d Cir. 2015) (affirming the district court's denial of a continuance request based on "serious health issues").

Even if counsel's decision not to seek a continuance was unreasonable, the Court is not persuaded that the decision was

prejudicial.  Mr. Olangian claimed he was prejudiced because the medicine affected his performance on the witness stand, which undermined his credibility.  (See Supp. Mot. at 11-12.)  However, he was certainly within the normal initial dosage range (0-60 milligrams (mg)) when he testified, and was within the normal initial dosage range throughout the trial if he followed the prescription.  See MAYO CLINIC, Prednisone (Oral Route): Proper Use, https://www.mayoclinic.org/drugs-supplements/prednisone-oral-route/side-effects/drg-20075269?p=1 (last visited Nov. 1, 2023) (stating that adults should start with 5 to 60 mg per day).

Mr. Olangian alleged that he was accidentally given 10 mg pills, instead of his normal 5 mg pills.  (See Olangian Decl. Ex. 1 at ¶ 6.)  As a result, he ended up accidently taking 80 mgs instead of 40 mgs during his initial dosage on November 3 and 4, 2016.  (Id.)  If that is true and he followed the prescription, he would have tapered to 60 mg the day before the trial.  (See Olangian Decl. Ex. 3 at 1 (stating "Take ONE 40 MG TAB x 4 DAYS, THEN 30 MG x 4 DAYS, THEN 25 MG X 4 DAYS, THEN 20 MG X4 DAYS, THEN 15 MG X4 DAYS, THEN 10 MG X 4 DAYS, THEN 5 MG X4 DAYS").)  He would have tapered to 50 mg on November 10, and 40 mg on November 14, leaving three full days of taking his intended 40 mg dose before he testified on November 17.  He also would have tapered to 30 mg on November 18, his second day on the witness stand.  (See Tr. at 1046.)

20

In his declaration, Mr. Olangian claimed that he tapered the prednisone in the manner he was typically prescribed, which he stated was tapering down the dose 5 mg (one pil) every five or seven days.[6]  (See Olangian Decl. Ex. 1 ¶¶ 4-5.)  If he did follow that manner with 10 mg pills believing they were 5 mg pills, and ignored the prescribed method, he would have been within the normal dosage (60 mg) prior to testifying on November 17: sometime between November 12 (if he tapered every five days) and November 16 (if he tapered every seven days).  Gov't Opp'n at 13.

In sum, Mr. Olangian has not shown how Mr. Ginsberg's decision not to seek a continuance was unreasonable under professional norms or how it was prejudicial to Mr. Olangian.

### c.   Counsel's Decision Not to Offer Certain Evidence Was Not Ineffective

Mr. Olangian claims that counsel was ineffective in failing to offer multiple forms of evidence that would have shown either that he hated the Iranian regime or that he never intended to consummate the weapons deals.  (See Supp. Mot. at 12-23.)  In response, the Government argues that "counsel's decisions not to introduce or draw attention to such evidence was a permissible strategy choice" and that "[t]hese strategic choices were not objectively unreasonable and would not have changed the outcome of

---

[6] Although he cited his typical method as tapering off every five or seven days, three of Mr. Olangian's previous prescriptions followed a five-day taper method.  (See Olangian Decl. Ex. 3.)

the trial, especially given the other evidence." (See Gov't Opp'n at 14.) The Court agrees with the Government's assessment.

Mr. Olangian believes that although Mr. Ginsberg offered multiple pieces of evidence that Mr. Olangian held a tremendous hatred for the Iranian government, he declined to include various pieces of evidence that were even more compelling. (See Supp. Mot. at 19-23.) This additional evidence includes a Green Movement protest video that featured his wife and that he helped produce; a photograph showing that he had a 9/11 magnet on his refrigerator; a photograph of him and his brother, who died later from longstanding injuries caused by Iranian militia members; and his immigration "A-File" that showed that his family members had suffered various injuries at the hands of the Iranian government. (See id.)

Mr. Ginsberg's decision not to introduce the above evidence was not objectively unreasonable because it could have been "unnecessarily cumulative." See United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998) (denying an ineffective assistance of counsel claim where counsel declined to call another witness who "would have testified in a manner corroborative of another witness; [because] counsel might well have regarded the testimony as unnecessarily cumulative"). Mr. Ginsberg had already introduced evidence highlighting the injuries Mr. Olangian's family suffered from the Iranian regime as a result of their participation in

opposition activities against the Iranian government, (see Tr. at 872-78), Mr. Olangian's personal experience as an activist protesting against the Iranian regime, (id. at 947-59), and called an expert, Dr. Patrick Clawson, to testify about Iran's political history to provide context for Mr. Olangian's motivation for exposing the Iranian government. (Id. at 837.) In both his opening and closing arguments, Mr. Ginsberg explained how Mr. Olangian's activism, his family's injuries at the hands of the Iranian state, and the Iranian political climate all fueled Mr. Olangian's desire to expose the Iranian regime. (Id. at 28, 31, 1334.)

Mr. Olangian also finds fault in Mr. Ginsberg's not using the "lack of a Russian visa or the defendant's text to Esmaeili to contradict the prosecution's key claim that the defendant was planning to go to Russia on October 13, 2012, to finish the supposed 'deal.'" (See Supp. Mot. at 17.) Mr. Olangian believes that if Mr. Ginsberg had mentioned that Mr. Olangian's American passports lacked a Russian visa when he entered Estonia on October 10, 2012, when he was scheduled to be in Moscow three days later, there would have been "reasonable doubt in at least one juror's mind about the defendant's intent to consummate the purported 'deals.'" (Id. at 14-15.) Additionally, Mr. Olangian states that his text to Esmaeili, an alleged co-conspirator, was a "pretext" where he acted angry with Esmaeili in order to provide an excuse

for eventually canceling the deals because he never intended to go through with the deals in the first place.  (Id. at 15-17.) Esmaeili was a man who supposedly was going to help finance the $80 million aircraft deal Mr. Olangian would consummate in Russia on October 13, 2012.  (See Olangian Decl. Ex. 1 at ¶ 13.)

Mr. Ginsberg's decision not to point out the lack of visa or discuss the text message was not objectively unreasonable. Mr. Ginsberg likely made the strategic decision that attempting to rebut the Government's evidence would only draw attention to its incriminating nature. He may have reasonably calculated that it was best not to focus on the specific events that took place in October 2012, as a reasonable observer would interpret those events as steps towards finalizing a weapons deal.  It was better for Mr. Olangian if the jury focused its attention away from the events of October 2012.  Instead, Mr. Ginsberg wanted the jury to view Mr. Olangian as an activist who despised Iran and never finalized any deals.

Specifically, with regards to the passport, the jury may not have believed that someone with travel plans to go to Russia in three days, who testified that he intended to go Russia, would not go to Russia because he lacked a visa on his American passport. As the Government has argued, he still had time to make travel arrangements or he could have possibly used his Iranian passport, which may or may not have had a visa.  (See Gov't Opp'n at 14.)

Regarding the text message to Esmaeili, Mr. Ginsberg may have reasonably concluded that the jury was more likely to view that text message as incriminating regardless of Mr. Olangian's claim that it was a pretext.

The Court does not see any prejudice in declining to introduce the passports or the text.  These pieces of evidence, even if believed by the jury, are trivial when compared to the weight of the other evidence illustrating his intention to finish these deals.  Most notably, although Mr. Olangian claims the lack of a Russian visa proves he never intended to go to Moscow to consummate the deal, he testified that he intended to go to Moscow the next day.  (See Tr. at 1075; see also Supp. Mot. at 23.)  Additionally, the text to Esmaeili on its face reads like a text from someone who is emotionally invested in consummating a deal: "What can this action of yours possibly be called?  Breach of promise, deceipt . . . you asked me if I trusted you?  In your opinion, can a person with these types of traits be trusted???"  (See Olangian Decl. Ex. 7.)

In sum, counsel's decision not to introduce or highlight certain pieces of evidence was reasonable and not prejudicial.  As such, counsel's decisions were not ineffective.

### d. Counsel's Decision Not to Argue in Closing Arguments That There Was No Proof of Mr. Olangian's Supposed $15 Million Bank Account in Turkey Was Not Ineffective

On October 10, 2012, the day Mr. Olangian traveled from Iran to Estonia, Mr. Olangian sent an email stating that he had "$15 million in a bank account in Turkey ready for deposit toward the purchase of aircrafts." (See Supp. Mot. at 23.) Mr. Olangian claims he did not actually have $15 million. (See id.) He also claims he wrote that email as a cover in the event the Iranian authorities questioned him about his trip to Estonia. (See id.) He believed that Mr. Ginsberg should have pointed out the Government's lack of proof during closing arguments. (See id. at 24.) Mr. Olangian believes that doing so would have strongly supported his claim that he never intended to complete any transaction. (See id. 23-24.) Mr. Olangian believes that counsel's failure to point out the lack of proof constitutes deficient performance and was not based on trial strategy. (See id. at 24.)

The Government believes that Mr. Ginsberg's decision not to pursue this argument was reasonably justified, considering that Mr. Ginsberg focused heavily on the theme that Mr. Olangian never intended to go through with any transaction and that he had never gone through similar transactions in the past. (See Gov't Opp'n at 17.) Mr. Olangian admits that Mr. Ginsberg discussed these themes. (See Supp. Mot. at 24.) However, Mr. Olangian believes

this evidence would have substantially supported his claim that all of his negotiations were a hoax and would have increased the probability of an acquittal or hung jury.  (See Reply at 10-11; Supp. Mot. at 24.)

The Supreme Court has stated "[j]udicial review of a defense attorney's summation is therefore highly deferential – and doubly deferential when it is conducted through the lens of federal habeas."   Yarborough v. Gentry, 540 U.S. 1, 6 (2003). Additionally, "[w]hen counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect."  See id. at 8 (citing Strickland, 466 U.S. at 690).  Given this presumption and deferential standard of review, a lawyer's decision not to pursue an argument will not be considered deficient performance if the lawyer has a reasonable justification for the decision.  See Dupont v. United States, 224 F. App'x 80, 82 (2d Cir. 2007).

After reading Mr. Ginsberg's summation, (Tr. at 1331-59), with the above standards in mind, Mr. Ginsberg's decision not to mention the lack of proof of $14 million in a bank does not constitute deficient performance.  Throughout summation, Mr. Ginsberg focused on Mr. Olangian's lack of intent to commit the alleged crime, the reality that he never completed any weapons deal, and his motivation for exposing Iran.  (See Tr. at 1334-39, 1357-59.)  Mr. Ginsberg wanted the jury's focus on Mr. Olangian's

27

subjective motivations, not the Government's mountain of objective evidence.  Arguing that there was no bank account could have been to Mr. Olangian's detriment because it would have highlighted the email, diverting the jury's focus away from Mr. Olangian's subjective intent and towards Mr. Olangian's incriminating communications.  Not following this line of argument was sound trial strategy.  Mr. Ginsberg's summation strategy is most evidently expressed in the closing's penultimate paragraph:

> But what is clear about this case, it's about intent and you're going to hear during the charge from the judge a phrase about 'actions speak louder than words' and there are a lot of words in [this] case spoken, read, said to you, written on emails.  But the action, the deals, the attempted deals, the conspiracy to do deals isn't there.  There is no action because Reza Olangian never intended it to be.

(See Tr. at 1358-59.)

Even if Mr. Ginsberg pointed out in closing arguments that there was no proof of Mr. Olangian's $15 million Turkish bank account, there is not a reasonable probability that it would have changed the outcome.  See Strickland, 466 U.S. at 694.  In sum, Mr. Ginsberg's decision was reasonable and not prejudicial.

### e. Counsel's Decision Not to File a Motion In Limine Was Not Ineffective

Mr. Olangian alleges that failing to file a motion in limine before trial to prevent the Government from introducing evidence of Mr. Olangian's alleged contact with weapons-for-drugs traders

28

in Tajikistan in 2008 constitutes deficient performance. (See Supp. Mot. 25-26.)

During trial, two DEA Agents mentioned this alleged contact. DEA Agent Higgins briefly mentioned it during his direct testimony when referencing Mr. Olangian's post-arrest statements. (See Tr. at 165 ("[h]e said that approximately five years before the interview, he'd been dealing with a Tajik group that was selling weapons in Afghanistan in exchange for Afghan heroin").) Later, DEA Agent Odney mentioned by name the gentlemen Mr. Olangian traveled to Tajikistan to meet in an "attempt to do a drug deal of some sort where he was going to trade heroin for Ak-47s." (Id. at 713.) Mr. Ginsberg then asked for a sidebar because he believed the Government had represented before trial that it would not elicit testimony regarding this uncharged crime. (Id. at 713-714.) The Government agreed to strike the question and answer, and the Court instructed the jury that the stricken question and answer should play no part in their deliberations. (Id. at 717-18.)

Mr. Olangian alleges that even though the jury was instructed to ignore that question and answer, it still influenced their decision-making. (See Supp. Mot. at 26.) Furthermore, he alleges that "[a] competent defense attorney would not have relied on a prosecutor's mere oral assurance that he would not elicit such highly prejudicial testimony during trial" and instead "would have

29

obtained a formal ruling in limine from the trial judge." (<u>See</u> Reply at 11-12.)

Counsel's decision not to file a motion <u>in limine</u> was reasonable. It is a strategic decision to instead engage in oral agreements. Declaring that it was unreasonable for defense counsel not to file a motion <u>in limine</u> to exclude evidence that he believed the Government promised not to produce would be the type of rigid requirement <u>Strickland</u> sought to avoid. See <u>Strickland</u>, 466 U.S. at 690.

Additionally, the Court of Appeals previously held that any error from this elicited testimony was harmless when "considered in the context of the entire trial record, along with the fact that the testimony was ultimately stricken and the district court subsequently provided a curative instruction." <u>See</u> <u>Olangian</u>, 803 F. App'x at 538. The Court agrees that the brief reference to these prior dealings did not prejudice Mr. Olangian. As such, the decision not to file a motion <u>in limine</u> was not prejudicial.

### f. Counsel's Decision Not to Object During Summation Was Not Ineffective

Mr. Olangian's final claim is that Mr. Ginsberg's decision not to object to the Government's repeated claim that Mr. Olangian lied during his testimony constitutes ineffective assistance of counsel. (<u>See</u> Supp. Mot. at 27; Tr. at 1247, 1253, 1297, 1313.)

Mr. Olangian is correct that the Court of Appeals has "been

30

critical of the prosecution's use of any form of the word 'lie,' especially when characterizing the defendant's testimony." <u>United States v. Thomas</u>, 377 F.3d 232, 245 (2d Cir. 2004) (citations omitted).  However, the use of the word "lie" is not improper when characterizing a witness's credibility, unless the use is excessive or inflammatory.  See <u>United States v. Peterson</u>, 808 F.2d 969, 977 (2d Cir. 1987).  Only in rare and extreme cases will such comments warrant a reversal or other relief.  See <u>Thomas</u>, 377 F.3d at 245.

The use of "lie" or "lied" was excessive or inflammatory here, especially considering that Mr. Olangian testified that "if I'm guilty of anything, I'm guilty of lying" when discussing his post-arrest statements.  (<u>See</u> Tr. at 1098.)

Additionally, the use of "lie" or "lied" was not prejudicial in this instance.  Mr. Olangian's entire defense theory predicated on the jury's believing that he never intended to consummate any of the deals, meaning he wanted the jury to believe that he was lying about who he was and what he wanted throughout all of his communications with purported weapons traffickers prior to his arrest in Estonia.  His credibility was clearly at issue throughout the trial.  It cannot be prejudicial for the Government to say that Mr. Olangian lied.

In sum, counsel's decision not to object to the Government's use of the word "lie" does not constitute ineffective assistance of counsel.

**IV.  Conclusion**

For the foregoing reasons, Mr. Olangian's motion to vacate his sentence pursuant to 28 U.S.C. § 2255 is DENIED.

Because Mr. Olangian has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue.  See 28 U.S.C. § 2253.  The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal.  Cf. Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

The Clerk of the Court is directed to close the open motions, (dkt. nos. 167 and 182 in No. 12 Cr. 00798 and dkt. nos. 1 and 10 in No. 21 Civ. 08166), and close case number 21 Civ. 08166.  The Clerk of the Court shall mail a copy of this order to Mr. Olangian.

**SO ORDERED.**

Dated:    July 15, 2025
          New York, New York

_Loretta A. Preska_
_____
LORETTA A. PRESKA
Senior United States District Judge